WeldoN, J.,
delivered tbe opinion of tbe court:
Oil tbe 6th day of August, 1884, tbe claimant and tbe collector of customs of tbe port of New York, who acted on *80 behalf of the defendants, made a contract, in substance, as follows:
“First. That said party of the first part (claimant) agrees to provide suitable barges, steamboats, or other vessels, according to the condition of the weather and subject to the approval of the collector of the port, to meet, between sunrise and sunset every day, each and every passenger steamer from a foreign port upon her arrival at quarantine, save and except such steamers as have their usual places of landing in the State of New Jersey.
“ Second. And to receive from every such passenger steamer all baggage belonging to the cabin and saloon passengers, furnishing the labor to receive and properly and safely stow such baggage on said barges,-steamboats, or other vessels, when delivered to him from said steamer, on board the vessels of the party of the first part, said delivery to be made by the employees of the steamship companies.
“Third. And to transport such baggage from each and every such before-mentioned passenger steamer (except those having landing places in New Jersey as aforesaid) by such barges, steamboats, or vessels, to the wharf .of the new Barge Office at the foot of Whitehall street in the city of New York and there to unload such baggage upon the bulkhead of said wharf.
“In consideration whereof the party of the second part (defendants) agrees to pay the party of the first part, the sum of sixty-seven cents for each piece or package of the before-mentioned baggage, except such pieces as are commonly known as-hand baggage.
“And it is agreed by the parties hereto that this contract shall commence and take effect from the twenty-seventh day of August, in the year one thousand eight hundred and eighty-four, and shall terminate on the twenty-seventh day of August, in the year eighteen hundred and eighty-seven.
“And it is further expressly agreed that this contract may be terminated by either party hereto upon sixty days7 notice for good and sufficient cause.”
On the 27th day of August, 1884, as provided in the agreement, the claimant entered upon the discharge of his duties, and continued to perform such duties until the suspension or annulment of the contract as hereinafter stated.
On July 10,1885, the collector of the port of New York, by direction of the Secretary of the Treasury, notified the claimant in writing, that at the expiration of sixty days from said date the contract “for the transfer of baggage from steamships will be terminated.” The sixty days’ notice ended on the 8th day of September, 1885.
*81 This suit was brought to recover damages as profits for the termination of the contract, upon the theory that such termination was without authority of laAv and in violation of the contractual rights of the claimant.
It is alleged that from the 10th of September, 1885, to the end of the time of the agreement, there arrived at quarantine at the port of New York passengers having 246,263 pieces of baggage coming within the description of such baggage as claimant had the right to carry under the contract, and that upon the performance of the contract as to such baggage he would have made a large profit.
The claimant also alleges as a cause of action, that between July 6,1885, and September 10,1885, there arrived at said port 16,063 pieces of baggage which he was entitled to carry under the contract, and upon which he would have made a large profit.
As another and distinct cause of action, the claimant alleges that between the 31st of August, 1885, and September 10,1885, there arrived at said port 786 pieces of baggage coming within the description of the contract, which were carried by him in pursuance to his obligation, but for which he has not been paid by the defendants.
Because of the termination of said contract and the unpaid amount, the claimant alleges he has suffered damages to the amount of $123,382.87, and for the recovery of that sum he brings this suit.
The plaintiff at the time he executed the agreement was one of the steamboat owners of the city of New York, had ample facility to perform the obligation of the contract; and the findings show that he performed and was ready to perform whatever was required of him by the defendants in pursuance of the agreement. It does not appear that the claimant made a formal protest against the cancellation of the contract; but he did not acquiesce, and was ready and willing to proceed in the execution of the agreement for the full term of three years as provided in the contract. There was no claim on the part of the defendants that the plaintiff had failed to perform his obligation, and in the cancellation of the contract they simply claimed to have exercised the power given them under that clause of the agreeement which provides: “This contract may *82 be terminated by either party hereto upon sixty days’ notice for good and sufficient cause.”
The findings show that 7C2 pieces of baggage (other than hand) was carried by claimant for which he has not been paid; that from July C to September 10,1885, the United States refused to deliver to claimant for carriage 15,715 pieces of baggage, which during that time had been received at the port of New Tork; and between the 10th of September, 1885, and the 27th of August, 1887, there arrived at said port 239,527 pieces of baggage coming within the description of the contract.
It is further shown by the findings that the damage in the way of profits to said claimant on the baggage not delivered and compensation for baggage delivered and carried for which he has not been paid amount to the sum of $55,527.
It is insisted by the counsel for claimant that the provision in the contract as to the right of termination simply “means cause good and sufficient in law for relieving either party from the contract,” and that it is limited even under the construction contended for by defendants to causes “that should arise after the contract was made.”
As a defense, it is insisted by counsel for the Government that under that provision of the contract it was within the power of the defendants to terminate the continuance of the agreement for any cause which in good faith the officer in charge of the execution of the agreement deemed sufficient, and that in this instance the Secretary was actuated by the highest and best motives of public policy. That the system established by the contract was an experiment which was not successful, and for that reason the Secretary had full power upon notice to discharge the Government from future obligation after the expiration of sixty days. It is also insisted that the Secretary had no authority to bind the United States by the contract upon which the present claim is founded; and if not void for want of power in the collector to make a contract as to the subject, then, that the collector had no authority to bind the United States by a contract running for a longer time than was required by the needs of the public service and the character of the work to be done.
Taking the defenses of the Government in the inverse order stated, and addressing the question of the right of the Secretary to make the contract as to the full length of time covered *83 by its contemplated performance, it is true that decisions of courts have held upon the question of the power of a municipal corporation to make time contracts, that as to many subject-matters, contracts covering unreasonable lengths of time are void on the ground of public policy. As has - been said, it is insisted by the counsel for the defendants that in the making of the contract for the space of three years the collector exceeded his authority (even if he had a right to make an agreement as to the subject-matter) and that there can be no recovery beyond perhaps what was actually earned by performance. To support this theory the counsel relies on the case of Stone v. Mississippi (101 U. S., 814):
“ The power of governing is a trust committed by the people to the Government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern, according to the scope of their discretion, if within the scope of their general authority while in power, but they can not give away nor sell the discretion of those that are to come after them in respect to matters the government of which, from the very nature of things, must ‘ vary with varying circumstances.’ ”
We do not regard the agreement in this proceeding open to the objection recognized in the Stone Case. It is true that the three years for which the contract was to run went beyond the probable limitation of the official tenure of the then Secretary, but that is not in itself sufficientj the contract must be void upon grounds of public policy in attempting to bind a municipal corporation to the exclusion of the right of succeeding officers to deal with the affairs of the public, and the deprivation of the right on the part of a corporation to take advantage of the varying circumstances and situations of the public good.
Considering the purpose for which the contract was made, the preparation and capital necessary to its performance, and the service to be performed, unvarying in its character, the objection that it was void upon the ground that it was let for a longer time than was required by the needs of the public is not well taken.
If the Secretary had the power to make the contract as to the subject-matter, the term of three years was not an unrea *84 sonable and illegal exercise of tlie power. It was not against public policy that tlie Government and tlie successors of the collector and Secretary should be bound by the terms of the agreement. If the contract had been made for an unreasonable period of time, impairing'the discretion and power of succeeding collectors and Secretaries and binding the rights of the defendant through the varying conditions and circumstances of such period, a very different question might arise as to the rights of the parties.
It is also contended by counsel for the defendants that the Secretary had no power to make the contract as to the subject-matter, and that therefore no recovery can be had in this proceeding based as it is upon the alleged legality of the agreement. Tlie contract purports to be made to carry out the provisions of the Act June 18, 1878 (20 Stat. L., 133), making appropriations for the building of a barge office for the examination of passengers’ baggage. The statute is as follows:
11 That the Secretary of the Treasury be, and he is hereby, authorized and directed to cause to be erected a barge office at the revenue dock, in the city of New York, with suitable sheds for the accommodation of passengers arriving by European steamers, in which to examine the baggage of such passengers, and for this purpose and for the extension of the sea wall on the present Barge Office site the sum of two hundred and ten thousand dollars is hereby appropriated out of auy money in the Treasury not otherwise appropriated.”
This act, as its title expresses, is an act for the construction of a public building, and does not in terms provide for the making of a contract such as is shown by the terms of the agreement on which this suit is based. The appropriation is limited to the sum of two hundred and ten thousand dollars which would have been more than exhausted by the compensation to be paid the claimant. The act does contemplate the bringing of baggage to the Barge Office, and to that extent the contract is germane to the purposes and object of the statute of 1878. But the fact that the agreement recites that it is to carry out the provisions of an act of Congress, and that such an act may not be broad enough to cover it, will not invalidate it as a binding contract, if under any law, by express provision or necessary implication, or regulation made in pursuance of law, the collector by the authority of Secretary had a right to make such an agreement. “ When a State descends *85 from the plane of its sovereignty and contracts with private persons, it is regarded pro hac vice as a private person itself and is bound accordingly.” (Hall v. Wisconsin, 103 U. S., 5; Davis v. Gray, 16 Wall., 203.)
It is tlie duty of tlie Secretary of the Treasury to collect through his multiplied agencies the revenue due the United States from custom duties, and the performance of that task is perhaps the most extensive and responsible duty assigned to any officer in the executive department of the Government. Section 3687, Revised Statutes, is as follows:
“There is appropriated, out of any money in the Treasury not otherwise appropriated, the sum of two million seven hundred and fifty thousand dollars, for the expenses of collecting the revenue from customs for each half year, in addition to such sums as may be received from fines, penalties, and forfeitures connected with the customs, and from fees paid into the Treasury by customs officers, and from storage, cartage, drayage, labor, and services.”
For the purpose of discharging the duty of the Secretary in the collection of customs a very elaborate system of regulations has been adopted, changed and modified from time to time, as the public service required. In the regulations of 1884 it is provided as follows:
“Art. 684. Public cartage of merchandise in the custody of the Government shall be let, after not less than thirty days’ notice, to the lowest responsible bidder giving sufficient security, subject to the approval of the Secretary of the Treasury. (18 Stat., 186, sec. 25.)
“Art. 685. All goods in bond, whether passing from the vessel or other conveyance in which imported to the warehouse, or from one vessel or conveyance to another, or from the warehouse on permits for exportation; all unclaimed goods, and all goods ordered to the appraiser’s stores for examination, and goods exported under the internal-revenue laws without payment of tax, will be carted, drayed, or lightered by responsible cartmen, draymen, or lightermen, under contract, or appointed by the collector, who shall require from each appointee a satisfactory bond, with approved sureties, conditioned for the faithful performance of the business assigned 1o such appointee, and who, while performing duty, will be known as customhouse cartmen, draymen, or lightermen, and, as such, held to a strict compliance with the warehouse regulations.
“They shall be under the control and direction of the inspector of the vessel, or storekeeper of the store, as the case may be, from which the goods are sent, and subject, while so employed, to the orders of the collector.”
*86 Section 3087 appropriated the sum of two million seven hundred and fifty thousand dollars semiannually for the “expenses of collecting the revenue from customs;” and the act of 1878 provided for the establishment and erection of a “barge office” in which to examine the baggage of passengers for the purpose of preventing frauds upon the Treasury. The contract was made in order that the defendants might more efficiently examine the baggage of passengers at the Barge Office, and at the same time facilitate the landing of passengers by avoiding the interruptions and delays incident to the former mode. Prior to August 27,1884, the customs examination of the baggage of cabin passengers arriving at the port of New York in steam ships from foreign ports was made by the United States customs officers at the respective landing places of the several steamers. The transportation' of baggage from the landing to (he Barge Office for examination was a change of policy, and to some extent an experiment on the part of the revenue officers, to accomplish more efficiently the prevention of frauds, the consequent collection of revenue, and for the further purpose of facilitating the landing of passengers.
It will be seen by reference to the Treasury regulations of 1884, that provision is made for cartage, drayage, and light-erage of certain goods, and while the baggage of a passenger does not come technically within the classes enumerated in the regulations, it is legally analogous to property transported while in the possession of the Government. The charge of 67 cents agreed to be paid by the United States to the claimant could not be imposed upon the passenger or the steamship company, and had to be paid by the defendants in order to carry out their policy of examining baggage at the Barge Office. The court holds, therefore, that it was within the j»ower of the collector by the authority of the Secretary to make the contract in controversy as to its subject-matter, and the only remaining question is, What are the rights of the parties under the agreement?
The serious question, in the opinion of the court, arises on that provision of the contract giving to either party a right to terminate the contract for “good and sufficient cause” upon giving sixty days’ notice. It is insisted in the able brief filed by the claimant’s counsel and also in oral argument, that “ good and sufficient cause for the termination of a contract about a matter of business means cause good and sufficient in *87 law.” The logical effect of that position is, that without a substantial failure to perform the agreement upon the part of one party, the other party would have no right to terminate the contract.
The contract was terminated by the notice of the defendants on the 9th of September, 1885, it having become operative from the 27th of August, 1884. It was terminated by the defendants for the reason that the plan of examining the baggage of passengers at the Barge Office was a failure, that it was expensive to the Government, inconvenient to the public, and did not tend to increase the efficiency of the service in the collection of duties. There- is no finding tending to show that the officers of the defendants in terminating the contract acted capriciously, or in bad faith, but, on the contrary, the findings show that they acted in good faith, and upon grounds of the highest public policy.
The plan contemplated by the agreement was to a large extent an experiment, and when it was found from an experience of about a year that it was objectionable it was determined by the Secretary of the Treasury to terminate its operation by giving the sixty' days’ notice. Both parties understood the agreement as it was construed by the defendants in their election to terminate the agreement. The fact that the contract specifies a fixed period for the notice of termination, and that, too, a substantial period, is an indication that the parties regarded the right to terminate as an important part of the agreement. The right to terminate the contract upon sixty days’ notice unaffected by the terms “for good and. sufficient cause” would be an undisputed power, and can the effect “for good and sufficient cause” be such as to limit the right to terminate the contract, to what may be denominated legal causes, such as a failure to perform, or any other defection on the part of either party? The right to cancel the contract for those causes is by the law presumed to exist upon the side of both parties, and needs no formal recognition by the terms of the agreement. Can it be said that the sixty days’ limitation refers to a condition dependent upon legal causes? If so, the contract would not terminate until sixty days after the notice was given, notwithstanding there may have been during the whole period a refusal to perform some of the most substantial requirements o-f the agreement.
What did the parties mean by “ good and sufficient cause,” *88 because that is the inquiry which the court makes in the interpretation of the agreement. Chitty says, ‘‘The object of the maxims which govern the exposition of contracts is to discover and give effect to the intention of the parties, so that the contract may be enforced according to the sense in which they mutually understood it at the time it was made.” (Chittv on Contracts, vol. 1, p. 104.)
The phrase “for good and sufficient cause” must be kept in the agreement, and it must be made to perform the function which was intended for it by the parties. Court may construe, but they can not eliminate substance, when it can be reconciled with other parts of the agreement and can be made useful in developing the thought and purpose of the parties. It seems that both parties thought and acted upon the theory that the right to terminate existed as it is now claimed by the defendants. In this connection, we may again refer to Chitty, “And where the intention of the parties to a contract is sufficiently apparent, effect must be given to it in that sense, though some violence be thereby done to its words; for greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent.” (Chitty on Contracts, vol. 1, p. 105.)
It is not necessary, as insisted by defendants, to go to the extent of holding that the words “good and sufficient cause” are ineffective. We hold that .in this case thej'' are effective to the extent that they circumscribe the power of the defendants to the limits of good faith, and change the power of cancellation from an arbitrary and absolute power to a power regulated by good faith on the part of the party exercising it.
The findings show most serious complaint by the public, shipowners, and by the Chamber of Commerce of the city of New York against the continuance of the system of examination made by the contract, and to avoid the inconvenience of it, and objection to it, the collector, under the direction of the Secretary, terminated the contract. The findings also show that the defendants acted in good faith, upon grounds reasonable and substantial, and which would induce a faithful public officer to do what was done, and therefore within the right of the defendants to terminate the contract for “good and sufficient cause.”
This view of the law disposes of the liability of the defend *89 ants as to the time for wbicb tbe contract was to run after tbe end of tbe sixty days.
For tbe baggage carried, there is due tbe claimant tbe sum of $510.55, and profit on baggage not carried (but wbicb was diverted by tbe defendants) during tbe sixty days covered by the notice tbe sum of $4,935.81, making tbe sum of $5,446.36. This amount is not contested (in case tbe contract is binding) subject to a deduction of $1,625 wbicb was made by claimant with bis boats during tbe time wbicb be might have carried tbe packages. It does not appear that tbe claimant could not have earned tbe $1,625, if tbe baggage bad been furnished, or that tbe defendants were deprived of tbe services of tbe claimant to that extent from services due from him under the agreement.
Tbe contract is not a hiring of a specific boat or number of boats, but an agreement on tbe part of tbe plaintiff to furnish a sufficient number of barges, steamboats, and other vessels to perform a certain service, and if that service was performed, tbe plaintiff had a right to perform any other services with bis barges and steamboats not incompatible with liis duty to tbe defendants. Tbe service for wbicb be received tbe sum of $1,625, was not taken from what be owed tbe Government, and was not tbe result of labor on tbe part of boats tbe whole time of wbicb was due tbe defendants.
Tbe right of tbe claimant to recover- damages as profits is well established by tbe decision of this court affirmed by tbe Supreme Court.
In tbe case of Speed (2 C. Cls. R., 429) it is said:
“Tbe measure of damages for tbe refusal to furnish for tbe slaughtering tbe whole number of bogs stipulated by tbe contract is tbe clear net profits tbe contractor would have made if tbe whole number bad been delivered according to tbe contract.”
In affirmation of tbe judgment of this court, tbe Supreme Court said:
“Tbe measure of damages is tbe difference between tbe cost of doing the work and the price agreed to be paid for it, making reasonable deduction for the less time engaged and release from tbe care, trouble, risk, and responsibility attending its full execution.” (8 Wall., 77.)
In the case of Behan (18 C. Cls. R., 687) this court held, in substance, that prospective profits, if proven, was an element *90 of damages wbicb might be recovered, and the Supreme Court in affirmance of tbe j udgment said, in substance, that profits might be recovered when they were the direct fruit of the contract and not too remote and speculative. (U. S. v. Behan, 110 U. S., 339.) These decisions indicate the uniform current of the law.
The judgment of the court is that the claimant recover the sum of $5,446.36.