**Walter HELSBY, Plaintiff,**

v.

**ST. PAUL HOSPITAL AND CASUALTY COMPANY and Mutual Benefit Health and Accident Association, Defendants.**

**No. 4–60 Civ. 200.**

United States District Court
D. Minnesota,
Fourth Division.

June 26, 1961.

Irvin Schermer, Sheldon J. Gensler, Schermer & Gensler, Minneapolis, Minn., for plaintiff.

John P. Vitko, Donald B. Smith, Randall, Smith & Blomquist, St. Paul, Minn., for defendants.

HENLEY, District Judge.

This suit, based upon an alleged breach of contract, was tried to Court and jury. The jury found in favor of plaintiff and assessed his damages at $156,000. Defendants have moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The case may be stated as follows:

On September 23, 1957, plaintiff entered into a "Broker's Contract" with defendant St. Paul Hospital and Casualty Company, hereinafter called St. Paul, under the terms of which plaintiff was authorized to sell in Minnesota health and accident insurance for the company and was to be compensated on a commission basis. The contract was for an indefinite period, terminable at the death of plaintiff or upon his becoming physically or mentally disabled. It was also terminable at the option of either party upon the giving of six months' written notice.

It was the intention of the parties that plaintiff should occupy himself, at least primarily, with the establishment and operation of the so-called "bank franchise" plan for the sale of health and accident insurance and the servicing of policies sold under that plan. Among other things plaintiff was to recruit, train, and supervise the agents necessary to put the plan into effect and to operate it efficiently and profitably.[1] It was

---

1. The bank franchise plan involved the sale of policies to clients of banks which were willing to participate in the plan. Premiums were to be paid by automatic

agreed that plaintiff should receive commissions amounting to 20 percent of the original premiums on policies sold by him personally, and a five percent overwrite commission on original premiums on policies sold by agents working under him. The contract provided further that if plaintiff should die or become totally and permanently disabled, or should retire from the insurance business, or if he should faithfully comply with the terms of the contract and should the contract be terminated voluntarily, he should have a vested right to certain commissions on renewal premiums on policies written by him or his agents during the life of the contract. The amount of such commission on renewal premiums was to be based upon the number of years plaintiff remained in the service of St. Paul and upon the gross premiums in force at the end of the calendar year prior to termination of the contract.

The parties operated under the Broker's Contract until December 1958, at which time they entered into an "Agent's Agreement," back-dated to September 23, 1957, the effective date of the original Broker's Contract. The Agent's Agreement, hereinafter at times called the contract, was executed by plaintiff on his own behalf, and on behalf of the company by M. M. Imm, its president, and C. I. Pilot, its assistant treasurer and bookkeeper.

The Agent's Agreement contained in general the same provisions as were set forth in the original Broker's Contract, but there was an important change in the termination provisions. St. Paul's standard form of Agent's Agreement provided for termination upon the death or disability of the agent, and also provided for termination at the option of

either party upon the giving of 30 days' written notice of intention to terminate. However, in plaintiff's contract the standard termination provision was modified so as to provide for voluntary termination upon 12 months' written notice "with cause."

In the latter part of August 1959, defendant Mutual Benefit Health & Accident Association, hereinafter called Mutual, purchased all of the stock of St. Paul and assumed control of its operations, with Frank J. Hogan, one of the vice presidents of Mutual becoming president of St. Paul. On August 31, 1959, E. S. Adams, one of Mutual's senior vice presidents and its Agency Director, addressed a letter to plaintiff advising him that Mutual had assumed St. Paul's obligations under the latter's agency contracts.

On June 23, 1960, St. Paul, acting through Oscar A. Lipke, its vice president, and one Gesell, its treasurer, wrote a letter to plaintiff advising him that St. Paul was rescinding the contract on account of alleged nonperformance and breach on plaintiff's part. In the same letter St. Paul assumed an alternative position, namely that if it was not entitled to rescind the contract, nevertheless it had "cause" to terminate the agreement in accordance with the provisions thereof, and that the letter should be considered as a notice of termination effective after 12 months. Nine alleged causes for termination were set forth.

On the same day St. Paul addressed a letter to the Minnesota Department of Insurance cancelling plaintiff's license to sell St. Paul policies. This suit followed.

It is the theory of plaintiff that the contract in suit was a valid and enforceable contract, that he performed his obligations thereunder, that he was guilty

---

charges against the insured depositors' bank accounts. The obtaining of the participation of a bank in the plan was called "opening" the bank. When a bank was opened and insurance sold to its depositors, a group policy would be issued covering all of the insured depositors. It was an essential part of the plan that the insurance of no participating depositor

would be cancelled except for nonpayment of premiums, unless the insurance of all of the members of the group was likewise cancelled. The plan was intended to be beneficial both to the company and to insured bank depositors. Presumably, the participating banks were to benefit also.

of no breach and had given St. Paul no cause for termination under the contract, and that St. Paul's action of June 23, 1960, was wholly wrongful. Plaintiff measures his damages by the present value of the net commissions, including commissions on renewal premiums (at times referred to as vested renewals), which he claims he would have earned but for the alleged wrongful termination of the contract.

Both defendants contend that the contract was void for various reasons, or that, if valid, the plaintiff failed to perform under it and was guilty of breach of contract. It is further contended that the contract was actually terminable at the will of either party notwithstanding the stipulation that voluntary termination should be "with cause" and upon 12 months' written notice. Both defendants also take issue with plaintiff as to damages.

In addition Mutual takes the position that it never assumed St. Paul's obligations under its agency contracts, and that, even if plaintiff is entitled to relief as against St. Paul, he has no claim against Mutual.

▆▆▆ Upon the trial of the case the Court took the view, to which it now adheres, that under the evidence all questions of the validity and interpretation of the contract were for the Court. Hence, the case was sent to the jury on the theory that, apart from any questions of nonperformance or breach, the contract was in and of itself a valid enforceable instrument and the jury was so instructed.

The issues submitted to the jury were, in substance, the following: (1) whether plaintiff had performed his obligations under the contract; (2) whether any breach of contract of which plaintiff may have been guilty had been waived by defendants; (3) whether Mutual had assumed St. Paul's obligations to its agents; (4) whether St. Paul had "cause" to terminate the contract on 12 months' notice; and (5) damages.

In their instant motion defendants renew their attacks on the validity of the contract and reassert their position that the contract, if valid, was terminable at will. They also assail the jury's factual findings including the finding as to damages.[2] In addition, defendants complain of alleged errors of the Court in ruling on certain questions of admissibility of evidence and in refusing to give certain instructions. To the extent that defendants challenge the factual findings of the jury, the evidence at the present stage of the proceedings is required to be viewed in the light most favorable to plaintiff, and he is entitled to the benefit of all favorable inferences that may be drawn logically from the evidence.

## I.

Taking up first the legal contentions of the defendants directed at the validity and interpretation of the contract, defendants contend that the contract is void for indefiniteness and for lack of mutuality of obligation, that the contract was a modification of the original Broker's Contract and did not comply with the requirements of the earlier agreement with regard to modifications, that the agents of St. Paul who executed the contract on its behalf acted beyond the scope of their authority, and that in any event the contract was terminable at the will of either party. In connection with the contention last mentioned, defendants assert that the provision for termination "with cause," which by implication prohibits a termination without cause, was not supported by any independent consideration or by any consideration at all, and that the phrase "with cause" is vague and indefinite and does not set up a discernible criterion by

2. The case was submitted on a general verdict, and in view of the size of the award it appears that the jury found that St. Paul had no cause to terminate the contract. Thus, under plaintiff's theory, the contract was terminable only by his death or disability or upon his voluntary termination of the agreement "with cause" and upon notice.

which a right to terminate may be measured.

Those contentions have been argued earnestly in defendants' thorough brief in support of their motion, but the Court is unable to accept any of them. The Court is convinced that as a matter of law the contract was valid and enforceable and that it was not terminable at the volition of either party without cause.[3]

The evidence discloses that in connection with his performance under the original Broker's Contract plaintiff received substantial assistance from two of St. Paul's home office employees. As time went on, however, those two individuals began to play a more and more active part in the operation of the bank franchise plan, and plaintiff, not without justification, became apprehensive that they would simply take over the plan after he had done the ground work, and that his contract would be terminated as could have been done upon six months' written notice.

Plaintiff repeatedly requested Mr. Lipke, the vice president of St. Paul, to curtail the activities of the two employees above referred to so as to protect the interests of plaintiff, but Lipke failed to do so. As an alternative and for the purpose of satisfying the plaintiff, it was agreed finally that plaintiff would be given a contract which, apart from death or disability, would not be terminable without cause and without a fairly long notice period. The period first discussed was five years, but Mrs. Imm, the company's president, was not willing to agree to so long a period, and the parties finally settled upon a one-year notice period. The contract in suit expressed the ultimate agreement.

■ While plaintiff did not agree in so many words to sell insurance for St. Paul, or to recruit, train, and supervise agents, he had in fact been performing under his original contract for more than a year, and when he executed the later contract, back-dated to the commencement of his service, he by implication agreed that he would perform under it. That an agreement to perform under a contract is implied rather than express makes it no less real. See 56 C.J.S. Master and Servant §§ 6, 7–8, pp. 67, 73–74; cf. E. I. DuPont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 227, 89 A.L.R. 238.

It is likewise true that the contract did not spell out in detail the duties that plaintiff was to perform or the means and methods that he was to use in achieving the contemplated results. But there was no occasion for such detail. Presumably, plaintiff, as a man of some experience in the insurance field, knew what he was supposed to do and how to do it.

■ In the Court's view there was mutuality of obligation for the entire contract, and consideration is to be found in the mutual promises of the parties. Further, it cannot be said that St. Paul derived no benefit from the termination provision or that plaintiff suffered no detriment on account thereof. As heretofore indicated, plaintiff was dissatisfied with the existing situation and was insisting that something be done to protect his interests. If nothing had been done, he was free to quit upon the giving of six months' notice, and it cannot be presumed that he would not have exercised that right. Regardless of what St. Paul may have thought of plaintiff and his services after December 1958, it is undisputed that when the second contract was made, St. Paul desired to retain plaintiff's services, and to that end was willing to agree, and did agree, that it would not terminate his employment except upon 12 months' notice with cause. Plaintiff agreed likewise that he would not voluntarily quit his employment without cause and without giving a year's notice, and he remained in the services of St. Paul until the latter terminated the contract more than a year and a half after it was made. St. Paul was willing to bargain for plaintiff's continued services in December 1958, and, for what-

---

3. This determination automatically disposes of defendants' contention that the Court erred in failing to instruct the jury on the question of consideration.

ever they were worth, it obtained those services.

As a part of their attack on the termination clause, defendants invoke the rule, recognized in Minnesota, that an agreement for "permanent employment" or for "employment for life" or the like, under the terms of which the employee is free to quit the employment at any time, will not be enforced against the employer unless the agreement for tenure is supported by consideration separate and distinct from the services which the employee undertakes to perform. Skagerberg v. Blandin Paper Co., 197 Minn. 291, 266 N.W. 872; see also Maple Island Farm v. Bitterling, 8 Cir., 209 F.2d 867, and Albers v. Wilson & Co., D.C.Minn., 184 F.Supp. 812. Here, however, plaintiff was not free to abandon his agency without cause. He was required to perform for so long as he was physically able to do so or until the contract should be terminated by one party or the other for cause and upon notice. That requirement appears to be sufficient to make inapplicable the rule invoked by defendants. True, both plaintiff and St. Paul had the power to terminate the contract at any time, as St. Paul in fact did, but a power to put an end to an agency relationship is not equivalent to a right to do so. Mason's, Dunnell's Minnesota Digest, § 226 and cases there cited.

It may be conceded that there is authority supporting defendants' argument that the word "cause" is too vague and indefinite to afford a standard for appraising the justification for a termination of an employment or agency contract. See Bushwick-Decatur Motors, Inc. v. Ford Motor Co., D.C.N.Y., 30 F.Supp. 917;[4] Cummer v. Butts, 40 Mich. 322, 29

Am.Rep. 530. However, there is authority the other way. See Quick v. Southern Churchman Co., 171 Va. 403, 199 S.E. 489; Local 205, United Elec., Radio & Mach. Workers of America v. General Elec. Co., D.C.Mass., 172 F.Supp. 53. Since this is a diversity case, it is the duty of the Court to ascertain the law of Minnesota on the subject and to apply that law when ascertained.

Neither side has cited a decision of the Supreme Court of Minnesota bearing on this precise question, but there has been exhibited to the Court a copy of the opinion of Judge Irving R. Brand, one of the judges of the Fourth Judicial District of Minnesota, Hennepin County, in Cederstrand v. Lutheran Brotherhood, Docket No. 524112. In that opinion Judge Brand wrote:

"Apart from the word 'cause' as bearing on the question of duration of employment, the word is not vague and indefinite insofar as the grounds for dismissal are concerned. It precludes arbitrary and capricious power in an employer to discharge an employee. Cf. [Quick] v. Southern Churchman Co., 171 Va. 402, [403], 417, 199 S.E. 489, 494–495 (1938) ('just cause'); Cummer v. Butts, 40 Mich. 322, 325 (1879) ('good cause'); Local 205, United Elec., R[adio] & M[ach.] W[orkers] v. General Elec. Co., 172 F.Supp. 53, 56 (D.Mass., 1959) ('cause'); Starin v. United States, 31 Ct.Cl. 65, 88 (1896). ('good and sufficient cause')."

The Court feels justified in accepting Lutheran Brotherhood as an accurate statement of Minnesota law. Cf. Kimble v. Willey, 8 Cir., 204 F.2d 238,

4. Affirmed 2 Cir., 116 F.2d 675. The district court holding that "cause" is fatally vague and indefinite in the present context is actually dictum since the Court found that there was no agreement that the contract should not be terminated except for cause. The Court of Appeals was divided on the subject. The majority agreed with the district court that defendant had a right to terminate either on the ground that there was never a restriction on that right or that the restriction relied on by plaintiff was fatally vague. Judge Clark, who wrote the opinion, preferred to base his decision on lack of restriction on the defendant's right to terminate and on the further ground that the commitments relied on by plaintiff were beyond the scope of the authority of the defendant's agents who allegedly made such commitments.

**392**

242, 38 A.L.R.2d 814. Moreover, this Court holds the opinion that the interpretation of "cause" as being not fatally vague and indefinite when used as a restriction on the right to terminate an employment contract is the better of the two available choices. In this connection the jury was instructed:

"You are instructed that the 'cause' which would justify St. Paul in terminating the contract upon 12 months' notice is not limited to a 'legal' cause which would justify a rescission of the contract; and it need not be an act or omission on the part of the plaintiff which would constitute a breach of contract. The provision now under consideration simply protected the plaintiff from an arbitrary or capricious termination of the contract; and the term 'cause,' as used by the parties, means anything which has prompted a reasonably prudent insurance company, acting honestly, fairly and in good faith, to put an end to the agency relationship existing between itself and its agent."

That instruction correctly reflects the law of Minnesota as expressed in Lutheran Brotherhood.

The original Broker's Contract provided that the instrument could be modified on behalf of St. Paul only by the action of two of the four of the company's major officers, namely, its president, vice president, secretary, and treasurer, and then only in writing, and it further provided that "failure of the company to insist upon strict compliance with any of the provisions of this agreement or any of the rules of the company shall not be construed as a waiver of such provisions or rules or affect the right of the company thereafter to enforce such provisions or rules."

Defendants point out that while plaintiff's second contract was signed on behalf of St. Paul by its president, C. I. Pilot who also signed for the company was not one of the four officers above mentioned, but merely the assistant treasurer and bookkeeper, and they contend that the second contract was not binding on St. Paul for that reason.

■■ There is no merit in that contention. The parties to a contract always have the right to modify their agreement or abrogate it entirely and make a new one. They may do so by any appropriate means notwithstanding self-imposed restrictions in the original instrument. 12 Am.Jur. Contracts, §§ 427–428; 17 C.J.S. Contracts §§ 374 and 377. Here, aside from any consideration of the statute of frauds, the parties, notwithstanding the provisions contained in the original agreement, could have modified that agreement by word of mouth, and, a fortiori, the later contract is not rendered ineffective merely because it was signed by only one of the officers mentioned in the original agreement.

■ It is further urged that the agreement not to terminate plaintiff's agency except for cause and upon 12 months' notice was beyond the scope of the authority of both M. M. Imm and C. I. Pilot. The short answer to this argument is that the contract was in fact executed in December 1958, and the plaintiff operated under it until June 23, 1960. The corporation was charged with knowledge of the existence of the contract and of its terms and conditions, and any want of original authority on the part of the corporate personnel who signed the instrument was cured by ratification, St. Paul having permitted plaintiff to operate under the contract and having accepted the fruits of his performance for approximately a year and a half prior to termination. Moreover, it is interesting to note that in the letter of June 23, 1960, whereby the contract was terminated, St. Paul did not even suggest that the contract was defective on account of insufficient corporate execution or on account of any lack of authority on the part of any corporate agent. In fact it recognized in that letter that if it was not entitled to rescind the agreement in its entirety, the termination was required to be for cause and upon a year's notice.

## II.

The evidence as to performance, breach, and waiver was conflicting, but there was substantial evidence which justified the jury in finding either that plaintiff fully performed his obligations, or that St. Paul accepted his performance and waived any defects therein or any breaches of contract of which plaintiff may have been guilty.

In this connection, it is noted that by December 1958 St. Paul had had more than a year's experience with plaintiff, and must have been thoroughly familiar with the nature and extent of his performance under the original Broker's Contract. With that knowledge St. Paul with its eyes open entered into the second contract.

In addition to testifying as to his performance, plaintiff introduced in evidence certain letters written to him by Mr. Lipke and a letter from Frank J. Hogan, dated May 12, 1960, after Hogan had become president of St. Paul. The Lipke letters, written both before and after December 1958, one being dated August 31, 1959, were expressly commendatory of plaintiff, and the Hogan letter contains no expression of dissatisfaction with his services, although the occasion for that letter was such as to lead naturally to an expression of dissatisfaction if any existed.

While defendants would brush the Lipke letters aside as mere form "pep letters" sent by an insurance company to all of its agents, the fact remains that the letters were addressed to plaintiff personally, and the jury had the right to consider them, along with all of the other evidence in the case, as bearing on the question of whether plaintiff had performed satisfactorily.

## III.

Defendants press hard upon the fact that at a gathering of insurance people held in Minneapolis on April 29, 1960, plaintiff in effect accused Lipke publicly of undertaking to "steal" the bank franchise plan from plaintiff, and threatened that if Lipke did "steal" the plan, plaintiff would sue St. Paul "for everything its got." It is contended that this accusation amounted to a breach of contract or at least afforded St. Paul "cause" for terminating the contract after giving 12 months' notice.

There is no question that unprovoked and uncondoned insulting or insubordinate language used by an employee or agent to an employer or principal, or to the latter's representative, may justify the discharge of the employee or agent. 35 Am.Jur. Master & Servant, § 48; Restatement of Agency, 2d Ed., § 380(b). And where there is no dispute as to the facts, and no question of provocation or condonation, it is for the Court to determine as a matter of law whether discharge was justified (Lubriko Co. v. Wyman, 3 Cir., 290 F. 12); but where the facts are disputed, or where questions of provocation or condonation are involved, the issue of whether discharge was justified is for the jury (ibid).

In Lubriko the ground urged as sustaining discharge was the use by a corporate employee of disrespectful and profane language toward his superiors in the corporate organization. In holding that the question was for the jury the Court said (at pages 15–16 of 290 F.):

" * * * Faithful service is of course a condition precedent to the right of wages. Therefore conduct of a servant involving insolent and disrespectful language, or disobedience of orders of a superior * * *; or tending to prejudice or injure his master's business * * *; or, what is more serious, amounting to insubordination * * * justifies the discharge of the servant. When the servant's conduct is not in dispute and is not affected by mitigating or extenuating considerations it is for the court to determine, as a matter of law, whether it constitutes cause for his discharge * * *. But where the facts are in dispute, what constitutes a ground justifying a discharge is a question for the jury. * * * This must be so, because in determining a question of

breach of duty arising from improper language or conduct, and hence in determining a question of justification for a discharge grounded thereon, the element of provocation, in some degree, is more than likely to enter and must be considered. To hold otherwise would mean that although the master may goad the servant into desperation, yet, if the servant does not submit respectfully he forfeits the right to retain his employment under the contract. * * * *

"On the law applied to the facts of this case, the question of justifiable discharge was properly one for the jury on the further ground that there was involved a fair question whether the servant's conduct had been in part condoned or was of such continuing character as not to admit of condonation. * * * *"

In Griffin Grocery Co. v. Thaxton, 178 Ark. 736, 11 S.W.2d 473, the corporate employer discharged an employee for alleged disrespect and insubordination. It appeared that the employee and the president of the corporation, after years of friendly business association, became estranged, which estrangement was characterized by "reciprocal caustic criticisms in frequent and lengthy letters written by each to the other." (178 Ark. at page 738, 11 S.W.2d at page 473). The employee sued for damages for wrongful discharge, and the jury decided in his favor. In upholding the verdict and the judgment entered thereon, the Supreme Court of Arkansas said (at pages 738–739 of 178 Ark., at page 474 of 11 S.W. 2d):

"Appellant's first contention for a reversal is that the court erred in denying its request for a directed verdict, on the ground that the undisputed evidence justified appellee's discharge. The undisputed evidence referred to consists very largely of the correspondence between appellee and Griffin heretofore referred to, which is too lengthy to be set out in this opinion. We have read these letters carefully, and have reached the conclusion that the letters of appellee constituting the alleged acts of insubordination and insolence were provoked, in a measure, by letters from appellant's president. At least we do not think the court would have been justified in directing a verdict. * * * *"

In the case at hand the effect to be given to the accusations made by plaintiff against Lipke, either as amounting to a breach of contract or as affording "cause" for termination of the contract, was properly left to the jury. The jury heard the evidence bearing upon the episode that has been described and the arguments of counsel directed thereto. The jury may well have concluded that plaintiff was not without provocation and some justification in making his charge, and that in any event plaintiff's conduct had been overlooked and condoned by St. Paul. In the latter connection it is noteworthy that the accusations were made on April 29, 1960, and the letter of termination was not mailed until July 23 of that year, almost three months later. Further, in the letter of termination this particular episode was not mentioned specifically, but was included in general terms and as simply one of a number of asserted grounds for termination. The jury might also have been of the opinion, as is the Court, that the episode did not have the significance at the time which defendants have later undertaken to attribute to it.

With regard to whether other matters relied upon by defendants supplied "cause" for termination of the contract, it is sufficient to say that in the Court's view the jury was justified in concluding that no "cause" for termination had been established.

### IV.

It is argued on behalf of Mutual that there was no substantial evidence justifying the jury's finding that Mutual had assumed the obligations of St. Paul to the latter's agents. Again, the Court refers to the letter of August 31, 1959, written to plaintiff by Mr. Adams advis-

ing that there had been such an assumption by Mutual.

 Assumption of St. Paul's obligations by Mutual cannot, of course, be based entirely upon the letter itself, nor is it contended that Adams had any authority to make such an assumption on behalf of Mutual. However, the fact that Mutual's agency director, who was also a senior vice president of that company, wrote such a letter is some evidence that there had been an assumption by Mutual of the obligations in question, and the force of that evidence is increased by the fact that Adams was not called as a witness. Had Adams written the letter under a misapprehension of what Mutual had done in connection with its acquisition of the stock in St. Paul, it would have been easy for him to have taken the witness stand and to have explained his mistake. The jury had a right to infer from the fact that Adams did write the letter and from the fact that he was not called as a witness that Mutual by affirmative corporate act had assumed the agency obligations of St. Paul, and Adams's letter was written advisedly and with authority. Similar letters seem to have been mailed to all of the St. Paul agents, and it is almost inconceivable that Mutual's top management was ignorant of the existence and contents of the letters, yet it does not appear that they were ever repudiated by Mutual, at least until this suit arose.

Mutual introduced in evidence as Exhibit S a certified copy of a resolution adopted by its board of directors on August 27, 1959, which resolution authorized the corporate officers to execute various contracts, one for purchase of stock in St. Paul "without other liability," another for the purchase of the management contract of Wisconsin Casualty Association, and a third to reinsure the business of Group Health Mutual, Incorporated. The officers were authorized "to take such steps as they deem expedient to provide for merger or continued operation of this business."

That resolution, read as a whole and with due regard to the final sentence thereof which has been quoted from, above, is not clearly inconsistent with an assumption by Mutual of St. Paul's agency obligations. The corporate officers may well have decided that such an assumption was "expedient" for the continued operation of St. Paul.

Whether Mutual in fact assumed the obligations in question was a matter peculiarly within Mutual's knowledge and, when plaintiff introduced the Adams letter, it became incumbent on Mutual to bring forward some evidence tending to negative the idea of assumption. The evidence which it did produce simply created a jury question.

V.

On the issue of damages the jury was instructed that if it found for the plaintiff and did not find that St. Paul had "cause" to terminate the contract upon 12 months' notice, plaintiff's measure of recovery would be "the financial loss, if any, which a fair preponderance of the evidence might show that plaintiff has sustained up to this time as a result of St. Paul's rescission of the contract, and the present value of such sum of money, if any, as the evidence may show with a reasonable degree of certainty he will lose in the future resulting from St. Paul's action in undertaking to rescind and terminate the contract." The jury was instructed that if it found for the plaintiff but further found from a fair preponderance of the evidence that St. Paul did have "cause" to terminate the contract upon notice, the measure of plaintiff's recovery would be the financial loss which a fair preponderance of the evidence showed that plaintiff had sustained up to the time of trial as a result of the action of St. Paul in rescinding the contract and in refusing to permit plaintiff to sell its insurance after June 23, 1960, and the present value of such financial loss as the evidence might show with reasonable certainty the plaintiff would sustain in the future as a result of not being retained as St. Paul's agent for the period between June 23, 1960, and June 23, 1961, the 12 months' notice period.

The jury was told that in measuring plaintiff's recovery, if any, it should take into consideration plaintiff's age and life expectancy, the condition of his health, his habits and disposition to labor, the volume of business produced by him in the past and the volume that might reasonably have been expected in the future, the expenses incident to plaintiff's carrying on of his business, the likelihood of policies issued under the bank franchise plan being kept in force or of lapsing, and any other facts and circumstances shown by the evidence which the jury might deem relevant.

As to mitigation of damages, the jury was told, in substance, that if plaintiff's duties under the contract were such as to require substantially all of his time and effort, and that he could not engage in other lines of work or sell other insurance without detriment to the proper performance of his obligations to St. Paul, he would be required to mitigate damages, but that he would not be required to mitigate if his obligations to St. Paul did not require all or substantially all of his time and effort, and if during the period of his agency he was free to engage in other lines of endeavor and could have engaged in such lines without detriment to St. Paul.

■■■ The Court has reviewed those instructions and is convinced that they declared the law correctly. The basic problem as to damages with which the Court is confronted is whether the jury's award of $156,000 was excessive.

Plaintiff, to establish the amount of his recovery, relied upon his own testimony and exhibits introduced in connection therewith, and upon the expert testimony of Melvin Harris, a certified public accountant, who made calculations of present values of plaintiff's future income had he remained in St. Paul's employ. Harris's calculations, which were based on certain assumptions made by him,

were expressed on two tables which were admitted in evidence over defendants' objections.

The defendants also adduced expert testimony relating to damages. That evidence consisted of the testimony of Richard W. Erdenberger, an actuary in the employ of Mutual, supplemented by certain exhibits.

The starting point of Harris's calculations was the figure $339,308.00 which was the amount of plaintiff's production of bank franchise plan insurance through the calendar year 1960 as shown on plaintiff's Exhibit No. 4.[5] Harris's first set of figures, plaintiff's Exhibit No. 11, was based upon the assumption that the bank franchise business would remain constant at the 1960 level. Harris's second set of figures, plaintiff's Exhibit 12, was based upon the assumption that plaintiff's commissions would increase 10 percent each succeeding year.

While plaintiff's Exhibit 11 assumes that the volume of bank franchise business would remain constant at the 1960 level, it also assumes that commissions received on vested renewals would decrease by 22 percent each year, that plaintiff would have to obtain new business each year to replace the lost renewal business, and that the production of such new business would entail expenses which should be estimated on the basis of those experienced in 1959. Those 1959 expenses, as shown by plaintiff's income tax return for that year, were $7,705.88.

Plaintiff's Exhibit 12, after assuming that commissions would increase 10 percent each year, goes on to assume further that plaintiff's expenses would increase at the same rate, and that his commissions received on vested renewals would decrease 22 percent each year.

In both sets of calculations Harris discounted plaintiff's net commissions and vested renewals at an annual rate of 4 percent computed quarterly.

---

5. Plaintiff's production as shown on his Exhibit 4 consisted of the total of new business written during a given year plus renewal premiums, less return premiums. Plaintiff testified as to the accuracy of

that exhibit. Of course, plaintiff's total production included not only his personal sales but the sales of agents working under him, on which sales he was entitled to an overwrite commission of 5 percent.

Having made his assumptions and determined his rate of discount, Harris proceeded to make his calculations of present values, using in that connection the Schedule of Vested Renewal Commissions appearing in the contract.

Both Exhibit 11 and Exhibit 12 show present values of net commission income and vested renewals based upon succeeding years of service commencing with eight, five more than plaintiff actually served, and ending with eighteen, ten more than he actually served.[6] Naturally, as the years of service increase, the present values increase.

Exhibit 11 shows that had plaintiff remained in St. Paul's employ for eight years, the present value of his net commissions and vested renewals would be $81,075.00, and that had his agency lasted for a total of eighteen years, such present value would be $171,926.00. The corresponding figures on Exhibit 12 are $111,272.00 and $392,557.00.

Defendant's witness Erdenberger summarized his testimony as to plaintiff's damages on two exhibits, Q and R. Both of those exhibits assume that plaintiff faithfully performed his duties under the contract. Exhibit Q appears to be based on the further assumption that the contract was terminable at will, and that when it was terminated in June 1963 plaintiff had 42 months' vested renewals. The figure reached on that exhibit was $18,944.92. Exhibit R assumes that the contract remained in force until June 23, 1961 (a year after notice of termination), and credits plaintiff with 48 months' vested renewals. The present value computed on that exhibit is $22,803.92.

As has been said, the jury returned a verdict of $156,000. That exact figure does not appear on any of the exhibits. However, plaintiff's Exhibit 11 reflects that the present value of plaintiff's net commissions and vested renewals based on 16 years of service would be $156,807,

and Exhibit 12 reflects that after 10 years' service the present value of plaintiff's net commissions and vested renewals would be $156,723.

In their motion defendants contend that the Court erred in overruling their objections to plaintiff's evidence and exhibits relating to damages on the grounds that plaintiff was not qualified to testify in that connection, that the exhibits were based on assumed facts not in evidence, that no proper foundation was laid for their introduction, that the exhibits do not include all relevant facts in evidence, and that they are conjectural and speculative. It is charged that the verdict is excessive and improper; that it is based upon uncertainty, remoteness, speculation, and conjecture; that it is unsupported by the evidence; and that it "appears to have been given under the influence of passion and prejudice."

It may be conceded that Mr. Harris was not an actuary or an insurance man, and that the assumptions upon which his calculations were based cannot be supported by his testimony, although the mathematics of his calculations is not challenged. He simply proceeded to make his calculations on the assumptions given him. He did not purport to establish the validity of those assumptions.

However, those assumptions find at least some support in the testimony of plaintiff himself, and he had had at least some experience with the bank franchise plan which, in the Court's estimation, qualified him to make predictions as to the future of the plan. Of course, the weight to be accorded to his testimony and the weight to be given to the figures supplied by Harris were matters to be determined by the jury.

In the circumstances the Court does not conclude that the evidence was insufficient to sustain a monetary award of some amount, and defendant's own evidence indicates that plaintiff did sustain substantial damage resulting from

---

6. On the exhibits themselves the years of service begin with "5" and end with "15," but an explanatory note indicates that the the three years of plaintiff's actual service must be added to the numbers of the years actually shown on the tables.

the termination of the contract. However, the Court does agree with defendants that the verdict was grossly excessive. Taking into consideration plaintiff's age, health, actual income earned in 1958 and 1959, and employment history, as shown by the evidence, the Court considers that the award of $156,000 as representing the present value of his financial loss resulting from the termination of the agency was completely unrealistic, although there is nothing to indicate that it was the result of any passion or prejudice on the part of the jury.

While the award actually made by the jury cannot be allowed to stand, plaintiff has sustained greater damages than defendants' direct evidence would indicate. Viewing the evidence in the light most favorable to plaintiff, the Court is of the opinion that it would support a verdict and judgment in an amount somewhere between fifty and sixty thousand dollars; and the Court is willing to enter judgment for $55,000 provided plaintiff is willing to enter a remittitur of the amount of the verdict in excess of that amount.

Two incidental questions remain for consideration. In their motion defendants assign as error the action of the Court in refusing to permit them to show that the capital and surplus of St. Paul at the time of its incorporation in 1957 was $150,000, the minimum required by Minnesota law, and that St. Paul sustained an operating loss of $14,229.04 in 1957, $28,845.13 in 1958, $161,757.77 in 1959, and $21.26 in 1960. The Court did not think at the time of trial, and does not think now, that the tendered evidence was competent. There was no showing that St. Paul was or in the future would be unable to pay plaintiff the commissions he would have earned had his contract not been terminated. Overall losses which St. Paul might suffer were of no concern of plaintiff. Nor was St. Paul's financial condition at the time of its incorporation material.

Complaint is made also that the Court refused to permit defendants to show that St. Paul wrote no new business under the bank franchise plan after December 31, 1960, and that the defendant as of that date had terminated all agents of the company who had sold insurance under that plan.

St. Paul's discontinuance of the bank franchise plan took place after it had breached its contract with plaintiff and after this suit had been filed, and evidence of such discontinuance was of doubtful competency. Further, to permit the introduction of evidence of the discontinuance without explanation would have been highly misleading as it would tend to suggest that the plan was not sound or profitable and that the discontinuance would have taken place for that reason in any event. Actually, as was developed in chambers in connection with the proffered evidence, the bank franchise plan of St. Paul was replaced at the beginning of 1961 with a generally similar plan that Mutual had put into operation. The Court was of the opinion that the explanation of the discontinuance neutralized whatever benefit defendants stood to gain by showing the bare fact of discontinuance, and that to let the jury know that Mutual, a much larger and stronger company than St. Paul, was using a generally similar plan would tend to be prejudicial to the defendants as far as damages were concerned. Upon those considerations the evidence was excluded altogether, and the Court adheres to its ruling.

Defendants' motion for judgment notwithstanding the verdict will be denied. The alternative motion for a new trial will be denied if, within thirty days plaintiff enters a remittitur to the extent of $101,000. Should plaintiff refuse to enter such remittitur within the time limited, the verdict will be set aside and a new trial granted. An appropriate order will be entered.