CARLSON EQUIPMENT COMPANY,
Appellee,

v.

INTERNATIONAL HARVESTER
COMPANY, Appellant.

No. 82–1345.

United States Court of Appeals,
Eighth Circuit.

Submitted March 15, 1983.

Decided June 30, 1983.

Marianne D. Short, Minneapolis, Minn., for appellee.

Mackall, Crounse & Moore, Frank A. Dvorak, Pamela S. Gagnon, Minneapolis, Minn., for appellant Intern. Harvester Co.

Before LAY, and JOHN R. GIBSON, Circuit Judges, and ROSS T. ROBERTS.*

JOHN R. GIBSON, Circuit Judge.

Carlson Equipment Company was awarded $200,000 by a jury in its claim against International Harvester Company based on IHC's termination of Carlson as its farm equipment dealer. IHC appeals from the

---

* The Honorable Ross T. Roberts, United States District Judge for the Western District of Missouri, sitting by designation.

judgment,[1] and argues that (1) the district court erroneously instructed the jury on "cause" for terminating the dealership agreement; (2) the district court erred in allowing corporate shareowners to testify as to the value of the business; and (3) Carlson's proof of damages was inadequate. We affirm.

Carlson had been an IHC dealer in the Wolverton, Minnesota area since the 1930's, operating in a corporate capacity since 1951. Carlson entered into the most recent dealership agreement with IHC on February 4, 1977. The agreement provided that no termination notice could be issued by IHC unless the dealer had breached certain obligations under the agreement, had been advised of such breach, and had been given a reasonable opportunity to rectify the breach. Among other things, the dealer was obligated to achieve a satisfactory market share for the equipment and service covered by the agreement; to implement and maintain an effective prospect and customer record system satisfactory to IHC; to employ sales personnel sufficient to obtain a satisfactory market share; and to aggressively promote the sale of equipment and service covered by the agreement.

IHC gave Carlson four written notices relating to sales deficiencies: on August 18, 1978; January 8, 1979; February 4, 1979; and July 13, 1979. The last notice stated that Carlson was in breach of the contract with respect to each of the obligations listed above and warned that a termination notice would follow unless Carlson took "appropriate corrective action" by October 31, 1979. The parties dispute the factual basis for the sales deficiency notices and what actions, if any, Carlson took after receiving the July warning. In any event, on February 12, 1980, IHC sent a notice which terminated Carlson as an IHC dealer effective August 15, 1980.

Carlson commenced this diversity action against IHC alleging that IHC breached the dealership agreement when it terminated

Carlson. IHC contended that it had cause to terminate the dealership. After a nine-day trial, the jury found IHC liable for breach of the dealership agreement and awarded Carlson $200,000 in damages.

IHC asserts that the district court erroneously instructed the jury on the definition of the term "cause" for terminating the dealership agreement. The court instructed the jury as follows:

In determining whether Plaintiff Carlson Equipment Company breached its duties under the dealership contract, you must determine whether a reasonably prudent agricultural implement company, acting honestly, fairly, and in good faith, would have been prompted to terminate the dealership contract. In other words, did International Harvester Company act as a reasonably prudent agricultural implement company would have acted under the same circumstances or similar circumstances when it terminated Carlson Equipment Company's dealership.

This instruction was taken from *Helsby v. St. Paul Hospital & Casualty Co.,* 195 F.Supp. 385 (D.Minn.1961), aff'd, 304 F.2d 758 (8th Cir.1962). IHC argues that the instruction omits the following language of the *Helsby* instruction:

The provision now under consideration simply protected the plaintiff from an arbitrary or capricious termination of the contract. . . .

IHC misreads *Helsby* in arguing that the *Helsby* instruction requires plaintiff to prove that defendant acted arbitrarily and capriciously in terminating the contract. IHC amplifies its argument by claiming that the omitted language makes the instruction erroneous as to what standard is to be applied in evaluating defendant's actions, and in placing the burden of proof on defendant rather than plaintiff.

■ We deal first with the standard to be applied in evaluating defendant's actions. *Helsby* states only that a contract providing for termination only for cause

1. Entered by the Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

protects the plaintiff from an arbitrary or capricious termination. The language in the instruction given by the court, whether a reasonably prudent implement company acting honestly, fairly and in good faith would have terminated a dealership under similar circumstances, establishes this protection. The language the district court chose to omit was thus redundant and the crucial language from *Helsby* which establishes the protection from arbitrary and capricious termination was contained in the instruction. We agree with the district court's ruling, both at the instruction conference, and on posttrial motions, that the instruction given was accurately based on the *Helsby* principles.

▋ IHC's argument that the instruction improperly shifted the burden of proof must be considered in light of all of the instructions. The court instructed that one of the elements necessary for plaintiff to recover was that "plaintiff must show that the defendant breached that contract." The jury was further instructed "that the plaintiff has the further burden of making a prima facie showing that plaintiff performed its duties under the contract." If plaintiff presented such evidence "then International Harvester has the burden of proving by a preponderance of evidence that there was good cause for it to terminate this contract." The record does not reflect that objection was made by IHC to these instructions. Had the objection been preserved, it is without merit. See *Helsby, supra*, 195 F.Supp. at 394; *Schenstrom v. Continental Machines, Inc.*, 85 F.Supp. 374, 380 (D.Minn.1949); 17A C.J.S. Contracts § 589. As we have observed, IHC's argument commences with a misreading of *Helsby*. This objection is without merit.

IHC also argues that the instruction erroneously sets out a reasonable man standard for appraising the justification for terminating the dealership agreement. The correct standard according to IHC is good faith, *i.e.* IHC need only prove that it acted in subjective good faith when it terminated the dealership agreement with Carlson for Carlson's failure to achieve a "satisfactory"

market share. The two cases on which IHC primarily relies, *Ard Dr. Pepper Bottling Co. v. Dr. Pepper Co.*, 202 F.2d 372 (5th Cir.1953), and *Silent Automatic Burner Co. v. Silent Automatic Corp.*, 214 Wis. 342, 252 N.W. 274 (1934), are inapplicable, for in each the contract clearly allowed termination upon the subjective dissatisfaction of the terminating party. The Carlson contract contains the following language: "In any event, the Company will consider any factors relevant to each Dealer's performance, so that while the dominant tests are to be objective ones, individual equities of the Dealer shall temper the results of such tests." The objective standard referred to in the contract clearly brings into play the reasonableness test which is set forth in the court's instruction.

IHC also relies on *Kotula v. Ford Motor Co.*, 338 F.2d 732 (8th Cir.1964), and *Woodard v. General Motors Corp.*, 298 F.2d 121 (5th Cir.), *cert. denied*, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962). These cases are inapplicable as they involve the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–25, which created a new cause of action where the automobile manufacturer fails to act in good faith with respect to its dealers.

▋ We observe that the language of the instruction given was part of the instruction submitted by IHC, with some paraphrasing by the court. IHC's primary objection is the omission of a specific passage from the submitted instruction. We have often held that when the district court fairly and accurately instructs on the applicable law, a party is not entitled to specific language that it may desire. *Property Tax Research Co. v. Falstaff Brewing Corp.*, 708 F.2d 1333, 1337 (8th Cir.1983); *Ybarra v. Burlington Northern, Inc.*, 689 F.2d 147, 154 (8th Cir.1982); *Stineman v. Fontbonne College*, 664 F.2d 1082, 1087 (CA 8 1981). *See also* 9 C. Wright & A. Miller, *Federal Practice and Procedure.*§ 2552.

We conclude that the jury was properly instructed. Since we conclude that the reasonableness standard was the proper standard, we need not reach IHC's argument

that the evidence was insufficient to show bad faith or improper motive.

■ IHC next contends that the district court erred in allowing two of Carlson's shareowners to testify as to the before and after value of Carlson's assets. Although Minnesota law allows an individual owner to testify as to the value of his property based on a presumed familiarity with its value, IHC argues that the same presumption does not extend to corporate shareowners and therefore a foundation must be established before the witness is allowed to testify. *Cf. L'Evesque v. Rognrud,* 254 Minn. 55, 93 N.W.2d 672 (1958) (an individual owner is presumptively acquainted with the value of his property; he may therefore testify to its value without any particular foundation); *City and County of Honolulu v. International Air Service Co., Ltd.,* 628 P.2d 192 (Hawaii 1981) (presumption of familiarity does not extend to corporate officers). Minnesota courts have not yet determined whether the presumption of familiarity extends to corporate shareholders. We conclude, however, that the district court did not abuse its discretion in ruling that the corporate shareowners here were shown to be sufficiently familiar with the business so that they could testify as to the value of the business. Delores Deike and Elizabeth Dietz, who testified concerning their opinion of the value of Carlson's assets before and after the dealership's termination, were not only corporate officers and shareowners of the closely held family corporation, but they had also performed bookkeeping and other services for Carlson for several years and had been involved in discussions concerning the sale of the business. *See also Lehman v. Hansord Pontiac Co.,* 246 Minn. 1, 74 N.W.2d 305 (1955); *Klapmeier v. Telecheck Int'l, Inc.,* 482 F.2d 247 (8th Cir.1973).

■ IHC argues that after Frank Carlson, Jr. sustained serious injuries in a fall at his home, damages were too speculative and not attributable to the termination of the dealership. Frank Carlson, Jr. was Carlson's president, majority shareowner, and chief salesman. IHC also argues that Carlson's proof of lost profits was based on pure speculation and conjecture and was impeached by Carlson's own business records. For the most part these arguments deal with factual issues and are a repetition of those presented for jury determination. There was evidence that Carlson's average annual profits were $45,000, that the present value of that sum over ten years was $301,000, and that approximately 88% of all retail sales of new equipment by Carlson from 1975 to 1979 were sales of IHC products. There also was testimony that the diminution in value of the business was $420,000. The district court thoroughly discussed IHC's contentions when it denied IHC's motion for judgment n.o.v. As the district court observed, the $200,000 damage award could be justified in several ways, including the logic that it was based on Carlson's claimed loss reduced by losses due to Frank Carlson, Jr.'s accident or Carlson's failure to mitigate its damages, or both. IHC's argument that as a matter of law damages were not established is rejected for the reasoning enunciated in the district court's thoughtful and detailed opinion.

We have carefully examined all of the arguments made by IHC and find them to be without merit. Accordingly, we affirm.