Israel **GANAPOLSKY** et al., Plaintiffs, Appellees,

v.

**PARK GARDENS DEVELOPMENT CORP.** et al., Defendants, Appellants.

No. 7600.

United States Court of Appeals, First Circuit.

March 8, 1971.

Ricardo L. Rodriguez with whom Alex Gonzalez and Gonzalez & Rodriguez, San Juan, Puerto Rico, were on brief, for appellants.

Herman W. Colberg, San Juan, Puerto Rico, with whom Reichard & Colberg, San Juan, Puerto Rico, was on brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Plaintiffs, Dr. and Mrs. Israel Ganapolsky, brought this diversity suit against Park Gardens Development Corporation and its insurer, United States Fidelity and Guaranty Company, for damages sustained by Dr. Ganapolsky allegedly due to Park Gardens' negligence. The jury awarded $50,000 to Dr. Ganapolsky and $10,000 to his wife. The district court denied defendants' motion for a new trial, and defendants appeal.

■ In reviewing the jury's verdict we take the evidence in the light most favorable to plaintiffs. On the evening of April 5, 1967, Dr. Ganapolsky went to visit his friend Ramon Mellado, who lived in the newly-developed Park Gardens section of Rio Piedras, Puerto Rico. Mellado was planning to take Dr. Ganapolsky to see an accountant to help him fill out his income tax return. Mellado sent Ganapolsky out to the car while he went to get something. Outside, Ganapolsky spotted a sign on a new house across the street and walked over to see it. While crossing a cement strip between the street and the sidewalk in front of the new house, his left foot caught in a hole, causing him to slip, twist his left leg and knee, and fall to the ground. The hole had been constructed for a water meter by Park Gardens, which had built the new house. There was testimony at trial that Park Gardens had a policy of leaving the water meter hole in front of each new house uncapped until after the house was sold, since the caps had frequently been stolen and were expensive to replace.

■ Defendants' principal contention is that the damages awarded by the jury are excessive. This court has often expressed its reluctance to overturn a jury award unless it is so excessive that the district court's refusal to order a new trial constitutes a manifest abuse of discretion. *Compare* Boston & Me. R. R. v. Talbert, 360 F.2d 286, 291–292 (1st Cir. 1966), *and* Commercial Union Insurance Co. v. Gonzalez Rivera, 358 F.2d 480, 484 (1st Cir. 1966), *with* Compania Trasatlantica Espanola, S. A. v. Melendez Torres, 358 F.2d 209, 214 (1st Cir. 1966).

■ In reviewing the award, we "make a detailed appraisal of the evidence bearing on damages." Grunenthal v. Long Island R. R., 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968). Dr. Ganapolsky testified that at the time of the accident he was making $1500 per month. He was unable to work for three months (loss of earnings: $4500) and then, because the pain in his leg made it impossible to work the long hours required in his former job, he was forced to take a new job paying only $850 per month (loss of earnings of $650 per month over twenty-two months: $14,300). In May 1969 he began supplementing his income with a private practice which yielded an average of $200 per month, and in July 1969 his monthly salary was raised to $900 (loss of earnings from May 1969 until the end of trial: $2500). Plaintiff also testified that he expected to undergo surgery recommended by his physician, immediately after which he would be unable to work and would lose an additional $3300 in earnings. We conclude that the jury could reasonably have awarded plaintiff $24,600 for lost earnings.

■■ There was testimony regarding the following medical expenses:

| | |
|---|---:|
| Orthopedic surgeon's fee | $1,000 |
| Orthopedic chair | 150 |
| Brace and special shoes | 220 |
| Medicine | 100 |
| | $1,470 |

Thus, $26,070 of the $50,000 verdict could reasonably have been assigned by the jury to special damages. That leaves $23,930 to cover such intangibles as pain and suffering from the accident and from the anticipated operation, the risk of a complication during the operation, and about a 10% or 15% disability which plaintiff was expected to have even after surgery.*

Dr. Jorge Rivera Diaz, the orthopedic surgeon who treated Dr. Ganapolsky,

---

* We note in passing that, although Puerto Rican law provides for broad recovery for all "damage caused through fault or negligence," Civil Code of 1930 § 1802, P.R.Laws Ann. tit. 31, § 5141 (1968), it does not allow punitive damages. Rivera Santos v. Rossi, 64 P.R.R. 683, 686 (1945); *accord,* Toro Mercado v. P. R. & Am. Ins. Co., 87 P.R.R. 625, 626 (1963).

testified that he believed Ganapolsky had torn the lateral miniscus, which is a piece of cartilage in the knee. He applied a cylinder cast which immobilized the knee for three to four weeks. After the cast was removed, Ganapolsky was forced to use crutches, then a cane, and finally a long leg brace. At the time of trial—some two-and-a-half years after the accident—he still had severe pains in his knee, particularly when standing or walking up and down stairs, and continued to experience a locking sensation in the knee on the average of two-to-three times a month. His ability to flex the knee was limited, and the muscles in his left thigh had atrophied.

After the cast was removed, Ganapolsky began to undergo physiotherapy. But, shortly thereafter, Dr. Rivera Diaz determined that the physiotherapy was not working and recommended surgery. Ganapolsky delayed in undergoing surgery because, as a former surgical resident, he was aware of the uncertainty of success and the risks involved. Dr. Rivera Diaz testified in detail about those risks, emphasizing that the joint is a very delicate structure, easily incapacitated by infection or eroded by bacteria. He noted that there is also always a risk involved in anesthesia, particularly with an obese patient like Ganapolsky.

Dr. Rivera Diaz further stated that Ganapolsky would probably be partially disabled even after the operation. The cartilage removed during the surgery would regenerate, but the new miniscus would be more brittle and less elastic than before. Plaintiff would always be predisposed to joint injury and residual pain. Since he was only thirty-six years old, this discomfort would continue for many years. In addition, the pain in his knee made it impossible for Ganapolsky to continue his residency training in neuro-surgery, forcing him to renounce a lifelong ambition to become a surgeon. We conclude that $23,930 is not excessive to compensate him for the pain and suffering, mental anguish, and probability of future discomfort revealed in the testimony at trial.

Mrs. Ganapolsky testified that she suffered much mental and moral anguish on account of her husband's accident. During the three weeks when he wore a cast she had to help lift him in and out of bed to go to the bathroom and to meals. He weighed 265 pounds. During his three months' confinement she had to care for him and their three small children without any outside help. Also, he was very nervous and upset and testified that

> "during the day [my wife] had to do everything, during the nights whenever I wanted something I had to wake her to give me that pill, that water, whatever that is, plus that being in bed, you know, a person that's used to being active, and working it makes you angry and upset and I was a person who used to be a calm individual, I had to look without seeing what was going to happen in the future, I had become very irritable, I was angry, yelling at the children and her. It was a tough situation."

Mrs. Ganapolsky testified that she suffered greatly both from her husband's nervousness and irritability and her own disappointment about the setback to his career. Even after he began his new $850 a month job, he was working only half days and continued to be angry and upset, requiring extensive care and attention during the afternoons when he was home. Mrs. Ganapolsky also testified that even at the time of trial it was often still necessary for her to help him stand up and sit down.

■■ It is well established that under Puerto Rican law a wife is entitled to recover for the "mental and moral anguish" she has suffered as a result of an injury to her husband. Civil Code of 1930 § 1802, P.R.Laws Ann. tit. 31, § 5141 (1968); *see* Commercial Union Insurance Co. v. Gonzalez Rivera, *supra*, 358 F.2d at 483; Hernandez Nieves v.

848

Fournier, 80 P.R.R. 94, 96–98 (1957). Defendants argue that Puerto Rican law will not permit a wife to recover damages for *caring* for her husband after he has been disabled since it does not permit her to recover for fulfilling the elemental duties of a wife. Civil Code of 1930 § 88, P.R.Laws Ann. tit. 31, § 281 (1968); Deynes v. Texaco (Puerto Rico), Inc., 92 P.R.R. 215, 218 (1965). But in *Deynes* there was no evidence of extensive physical labor on the wife's part. Furthermore, defendants neither objected to Mrs. Ganapolsky's testimony about caring for her husband, nor did they request that the jury be instructed to disregard that testimony. Although $10,000 seems to us a very high award, even considering the physical labor involved, we cannot say that it is so high that the trial judge committed a manifest abuse of discretion in sustaining it.

■ Defendants also object to a summation made by the trial judge at the close of plaintiffs' evidence. The judge made the summation in order to refresh the memory of the jury, which had just returned from a four-day-weekend recess. He had requested and received the prior consent of all the parties and presented a fair, unbiased review of the evidence. He cautioned the jury that, although the summation might appear to favor plaintiffs since only their evidence had been heard thus far, any intimations he might make about the credibility of the witnesses must be disregarded. At the request of one of the defense attorneys, he added one piece of evidence he had inadvertently omitted and indicated his willingness to add other points the attorneys might raise. Defendants did not request a comparable summation at the close of their evidence. We conclude that the judge acted both fairly and in an appropriate manner.

■ Finally, defendants are in no position to claim that they were "surprised" by Dr. Ganapolsky's testimony about his loss of earnings and the effect he expected his disability to have on his medical practice in the future since he had presented similar testimony in his deposition.

Affirmed.