Joseph **BRAUNSTEIN**, Trustee, Etc., Plaintiff, Appellee,

v.

**MASSACHUSETTS BANK & TRUST COMPANY**, Defendant, Appellant.

No. 71–1022.

United States Court of Appeals, First Circuit.

June 15, 1971.

Joseph Landis, Boston, Mass., with whom Wasserman & Salter, Boston, Mass., was on brief, for appellant.

Herbert Weissblum, Boston, Mass., with whom Julius Thannhauser and Cohn, Riemer & Pollack, Boston, Mass., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This is a plenary action brought by the trustee in bankruptcy of Shaker Shoppes, Inc., against the Massachusetts Bank & Trust Company (the bank) to set aside as a preferential transfer a security agreement given to the bank by Shaker within four months of the filing of a petition in bankruptcy against it; and to recover the value of the property which was the subject of the transfer. The jury found that the transfer constituted a voidable preference and awarded

the trustee $32,000, representing the value of the property transferred. The bank appealed.

In July 1966 a Mrs. DeYoung organized Shaker as a retail women's sportswear store in Sharon, Massachusetts, and was its principal officer and stockholder. She made an original investment of $10,000–$15,000. The store opened on October 7, 1966. Between September of that year and August 1967 the bank financed the business by a series of unsecured loans which had maturities of three to six months. None of these loans were ever repaid and the notes were renewed as they became due or overdue. On August 29, 1967, the date of the last loan, the balance due exceeded $30,000.

Mrs. DeYoung testified that the corporation was short of working capital from the day it opened its doors and that by the end of 1966 the business was "in a sad state" as "there wasn't enough capital to continue * * *." Early in 1967 the business was in a "hole." "It was still actually insolvent." During the second quarter of that year the corporation did not have sufficient assets to cover its liabilities. On receiving a $5,000 loan from the bank in April 1967, the corporation took care of one of its creditors but could not pay its other obligations as they became due.

In the summer of 1967 two creditors to whom the corporation owed some $4,700 put a keeper in the shop. Mrs. DeYoung called the bank and the latter introduced her to an attorney named Kelleher. He invested some $4,800 in the business, which he borrowed from the bank. This money was used to get the keeper out of the shop and in return Kelleher received 51% of Shaker's stock and became its treasurer. It was understood that from then on he would endeavor to straighten out and handle the financial end of the business.

In August, September, and October, 1967, Shaker's financial condition failed to improve. At the beginning of October, Mrs. DeYoung told the president of the bank that "she could not continue the business the way it was going." The corporation was being dunned by its creditors and was then in default on two loans to the bank, which was making repeated demands for payment.[1] On or about October 24, 1967, the bank, fearful that its loans might be in jeopardy, demanded that Shaker put up security for the outstanding loans, the total amount of which still exceeded $30,000. As a result, on October 24, 1967, Shaker executed and delivered the security agreement in issue in this case, covering all of its personal property. Mrs. DeYoung testified that at the time this security agreement was executed "the liabilities were greater than the assets." No contemporaneous or future loans were secured by this agreement. Plainly, its sole purpose was to cover outstanding indebtedness.

Shortly thereafter, matters came to a head. On November 13 the bank notified Shaker that it intended to repossess "the goods covered by the security agreement" in fourteen or more days from the date of the notice, and in the latter part of November it closed the shop.[2] In January 1968 the bank sold the collateral at a private sale for approximately $32,000. An involuntary petition in bankruptcy was filed on January 29, 1968, and Shaker was adjudged a bankrupt on March 12, 1968.

In addition to the above facts, the trustee put in evidence the schedules of the bankrupt and an accountant's uncertified Interim Financial Report with reference to Shaker's financial condition as of May 31, 1967. This report had been compiled at the instance of the bank.

The bank concedes that there was evidence from which the jury could find

---

1. The record also indicates that Shaker overdrew its checking account with the defendant on an average of about five times a month while it was in business.

2. Even then the bank had to pay a gas bill and back rent for the shop on Shaker's behalf.

that at the time this transfer was made it had reasonable cause to believe that Shaker was insolvent. It contends, however, that neither the unliquidated debts shown in the bankruptcy schedules nor the Interim Financial Report should have been admitted in evidence and that, absent these, there was no substantial evidence from which the jury could find that Shaker was actually insolvent. Also, the bank objected to the court's instruction to the jury with reference to the bankruptcy schedules (1) because they were not supported by proofs of claim, invoices or testimony of the creditors and (2) because the court permitted the jury to use the schedule figures as if they were established debts. We are not impressed by either of these arguments.

■■■ There was evidence that Shaker's financial condition had changed but little between the transfer date and the date of the petition in bankruptcy. Therefore the schedules could be retrojected. Hassan v. Middlesex County National Bank, 333 F.2d 838, 840 (1st Cir.), cert. denied 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964). They may not have been dispositive but they were certainly probative evidence. McClung-Logan Equipment Co., Inc. v. Friedman, 195 F.2d 516 (4th Cir. 1952); see also Margolis v. Gem Factors Corp., 201 F.2d 803, 804 (2d Cir. 1953). As to the weight to be accorded the figures, the trial court carefully cautioned the jury that they would have to determine which debts were in existence on the transfer date in order to use the schedules in determining insolvency. We think that the bank's objection concerning the validity of the debts listed in the schedules was untimely. This objection really went to the question of admissibility and, not having been made at the time the schedules were admitted, was waived. See also Abdo v. Townshend, 282 F. 476, 479 (4th Cir. 1922).

■■■ We now consider the admissibility of the Interim Financial Report. This was a statement of Shaker's financial position and a statement of income and expenses for the period ending May 31, 1967. It was not audited and the assets and liabilities were not verified by independent means. Of course, the actual books and records would have been admissible under 28 U.S.C. § 1732 (1964), but there was evidence that, although the trustee had made diligent efforts to obtain all of the bankrupt's business records, the bankrupt was unable to produce them all. There was no indication that the report was not a faithful recitation of the material presented to the accountant. The trial judge stressed that the accountant had not verified the validity of the assets and liabilities and instructed the jury that whether the figures in the report were "accurate or accurately reflect the status of the business, is a matter for you to later decide." Under the circumstances, we think the summary was admissible as the best available evidence. United States v. O'Connor, 433 F.2d 752, 754 (1st Cir. 1970), cert. denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971); Sylvania Electric Products Co., Inc. v. Flanagan, 352 F.2d 1005, 1008 (1st Cir. 1965); Abdo v. Townshend, supra.

■ The question of Shaker's insolvency on the effective date of the transfer was a question of fact for the jury. There was ample evidence in the record to warrant its finding that Shaker was insolvent on that date and that the security agreement in question was a preferential transfer.

■ The jury's finding that the value of the property preferentially transferred to the bank was $32,000 is also amply supported by the evidence. The bank concedes that following its sale of the repossessed assets in January 1968 it credited Shaker's loan account with approximately $32,000. Also, the bank's then president testified that the property was sold for about that figure. In fact, the jury could have reached the

same figure from other evidence in the record.[3]

■■ On the issue of value the bank sought to introduce evidence that the goods in question were sold on credit for $32,000; that the buyer defaulted and that the bank resold the property to a second buyer, also on credit, for $32,000. The court excluded this evidence and the bank made an offer of proof. The bank contends that the exclusion of this evidence was reversible error. We do not agree. The value of the property transferred is its fair and true value as of the time of transfer. Perkins v. Remillard, 84 F.Supp. 224, 227 (D.Mass. 1949); Welsch v. Palumbo, 321 Mass. 399, 73 N.E.2d 844 (1947); *see also* Jentzer v. Viscose Co., 82 F.2d 236, 238 (2d Cir. 1936). Furthermore, the question of value is totally divorced from whether the bank sold the goods to one who was unwilling or unable to pay for them. *See* Levy v. Weinberg & Holman, Inc., 20 F.2d 565, 568 (2d Cir. 1927).

The bank contends that the case of In re Hygrade Envelope Corp., 393 F.2d 60 (2d Cir.), cert. denied, 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968), establishes a different rule of valuation. In that case Hygrade had transferred to a creditor an insurance policy in the face amount of $100,000 on the life of one of its officers. At the time of transfer the cash surrender value of the policy was $393. Less than a month after the transfer the insured died and the creditor received $101,000 as the proceeds of the policy. Within four months after the date of transfer, Hygrade filed a petition in bankruptcy. The trustee sued to recover the proceeds of the policy as a preference. The court found that the transfer was preferential and that the trustee was not limited to recovery of the cash surrender value, or to $1,000, the replacement value of a similar policy. We think *Hygrade* is clearly distinguishable from the instant case in that there the court noted that "the case is the unusual one where 'market value' affords no real indication of an asset's worth." *Id.* 393 F.2d at 64. Not so, in the instant case. Moreover, unlike the instant case, *Hygrade* did not involve a conversion by the creditor.

■ Nor did the trial court err in instructing the jury that in determining the transfer value it could consider the fact that the bank had credited Shaker's loan account in the amount of $32,000. Rosen v. Somerset, 329 Mass. 250, 256, 107 N.E.2d 303, 307 (1952), relied on by the bank, is not to the contrary. There the court chose not to rely solely on the crediting of an account in order to determine the value of the property involved and sent the case back to the trial court for a further report as to value. That result is not required here where the jury considered the crediting of $32,000 along with other evidence.

■ Finally, the bank did not preserve its right to complain that the jury's verdict was excessive. It filed no motion for a new trial or for judgment n. o. v. This court is not prone to disturb a jury verdict unless the amount awarded is palpably excessive. Ganapolsky v. Park Gardens Development Corp., 439 F.2d 844 (1st Cir. 1971); Boston & Me. R. R. v. Talbert, 360 F.2d 286, 291 (1st Cir. 1966). The award here is not excessive. In our opinion it is supported by the evidence.

Affirmed.

---

3. Shaker's inventory at cost was estimated to be worth $12,000 to $15,000. An appraisal by the bank in November 1967 showed a value of $14,000. The customary markup of 33⅓% would yield a fair market value of $16,000 to $20,000. There was testimony that the furniture and fixtures installed only about a year before the transfer "might have been worth close to $10,000 to someone taking over the location and business on October 27, 1967." The accounts receivable were valued as of October 24, 1967, at approximately $3,000.