Dora Iris BETANCOURT et al.,
Plaintiffs, Appellees,

v.

J. C. PENNEY CO., INC., et al.,
Defendants, Appellants.

No. 75–1448.

United States Court of Appeals,
First Circuit.

Argued Feb. 7, 1977.

Decided May 18, 1977.

Oronte Oliveras Sifre, San Juan, P.R., with whom Agrait, Otero, Oliveras & Collazo, San Juan, P.R., was on brief, for defendants, appellants.

Sigfredo A. Irizarry, San Juan, P.R., for plaintiffs, appellees.

Before COFFIN, Chief Judge, INGRAHAM,* and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

On November 3, 1973, the plaintiff-appellee, Mrs. Dora Betancourt, was struck on the right shoulder when an automobile tire fell from a rack in the automotive section of the J. C. Penney store in Hato Rey, San Juan, Puerto Rico. Personally and for her four minor children she brought this negligence action in the District Court for the District of Puerto Rico. A jury awarded Mrs. Betancourt $60,000 damages, and also awarded $15,000 each to her four children for damages sustained as a result of her incapacitation. After trial, the district court awarded $10,000 attorney's fees to plaintiffs on grounds that defendant's contesting the issue of liability was obstinate. *See Pan American World Airways, Inc. v. Ramos*, 357 F.2d 341, 342 (1st Cir. 1966).

On appeal J. C. Penney Co. does not contest liability or the district court's decision to award attorney's fees. Rather, it contends that both the amount of damages awarded and the amount of attorney's fees were excessive. We agree that the damages awarded were so excessive that the district court abused its discretion in denying Penney's motion for a new trial on the issue of damages. We also think that because there was no evidence in the record to support the award of $10,000 in attorney's fees that this amount cannot stand.

* Of the fifth circuit, sitting by designation.

1. This evidence was admitted ostensibly to explain why she did not seek medical care right away, rather than waiting for nearly three months, and the court so limited it. While admission of the evidence is not an issue on appeal, we believe it is the kind of evidence the

On whether a district court erroneously refused to order a new trial we recently said in *LaForest v. Autoridad de las Fuentes Fluviales*, 536 F.2d 443, 447 (1 Cir. 1976),

"[T]he rule of review commonly applied by federal appellate courts with respect to civil jury awards . . . is that the jury's otherwise supportable verdict stands unless 'grossly excessive' or 'shocking to the conscience.' "

And in reviewing a jury's award we are constrained to view the evidence in the light most favorable to the plaintiff. *Rivera v. Rederi A/B Nordstjernan*, 456 F.2d 970, 974 (1st Cir. 1972). With these principles in mind, we summarize the evidence.

Mrs. Betancourt, a divorced mother, has four children who, at the time of trial in 1975, were ages 9, 11, 14 and 16. On November 3, 1973, while on the business premises of defendant Penney where she was arranging to have her car repaired, she was struck by a tire which fell suddenly from a rack onto her right shoulder. She testified to experiencing terrible pain, fear and dizziness. After resting briefly at a store clinic, where she was administered smelling salts, she drove to her home, stopping from time to time because of the pain and dizziness. She took aspirin that night for the pain, and on the next day considered going to the hospital, but did not do so because of a commotion caused when her alcoholic ex-husband showed up at her house in a deranged condition and threatened her and the children before finally being removed by the police.[1] He continued to bother her and the children until he was sent to a mainland clinic sometime before the end of 1973. For the rest of November and December, 1973, and much of January, 1974, Mrs. Betancourt continued to function without obtaining medical attention, going to work and looking after her children. However, the jury could have found from her testimony that she was in more or less constant pain and could not take part in

court might have considered excluding. *See* Fed.R.Evid. 403. Its relevance was, at best, marginal since Mrs. Betancourt did not visit a doctor until long after the husband's removal from the scene. It has obvious potential to engender sympathy for the plaintiff and her family so as to cause an inflated verdict.

shared family activities such as outings, Christmas parties, visits to museums, and her father's birthday party. Also her ability to shop, manage the household, and provide companionship and direction for her single-parent family was impaired. She testified to taking pills obtained at the local pharmacy to soothe the pain. In January, 1974, she had to forego a 19 day trip to South America, which she valued at $1500, that a friend had offered her expense free. In January and February she also missed the Trini Lopez show at the Hotel San Juan, her daughter's Valentine Party and the San Juan Bicentennial. On January 22, she felt so badly that she had to leave work early. Her pain became so severe during this period that she could not answer the phone and her children had to lift her head and help her to and from bed. Throughout the rest of January and during February and into March she was in great pain, and stayed home from work for about eight days.

She testified that the increasing pain caused her to pay her first visit to a physician, Dr. Horn, on January 25, 1974. He testified to seeing her on four occasions, the final visit being March 22, 1974. His examination revealed a straightening of the cervical spine, limitation of the movement of the shoulder, and marked swelling of the cervical spine. There was no fracture. He prescribed a neck collar, and she thereafter wore collars of two types. While Dr. Horn, formally discontinued the collar on March 22, 1974, Mrs. Betancourt testified to continuing to need one at various times afterward. She pointed out the embarrassment and difficulties attendant upon its use, especially when she was typing and doing office work. She also used a "magnet" for sleeping purposes.

On one occasion Dr. Horn suggested that Mrs. Betancourt receive a massage, leading her to see a chiropractor, Dr. Augustus Rodriguez,[2] for a total of three or four visits, the first being on March 9, 1974, and the last of that series, being on June 1, 1974. She saw him once in 1975 several days before trial. When he first examined her on March 9, 1974, Dr. Rodriguez reviewed the X-rays Dr. Horn had taken. He found a misalignment of the fifth cervical vertebra of the neck. He testified that this had been caused by the tire injury, and that it affected the spinal nerves, so as to cause a cervical or spinal radiculitis, described by him as inflammation of the spinal nerve roots accompanied by pain and loss of sensation. Dr. Rodriguez noted a loss of strength in her right hand. He told her at this time that she should have eight treatments but, for some reason, she stopped coming after the June 1, 1974 visit.[3] When he next saw her, on June 25, 1975, two days before trial, he formed an opinion that if she would accept treatment twice a week for three months she would feel "just about completely well in her initial condition and recuperate the strength of the hand." Prescribed treatment would consist of manipulating a rubber ball in her weak hand, spinal manipulation and traction. However, while she "will heal and live a normal life almost free of pain", she "will have pains on and off throughout the years" since remissions may occur.

Mrs. Betancourt's testimony at the trial, twenty months after the injury, was that while she felt much better, she still had had bad moments, when there was pain for from three to five days, and she wore the brace again. She said the strength in the right hand was poor and was a source of concern.

The parties stipulated to doctors' bills totalling $210, medical expenses of $37.25, and transportation expenses (from work, when she was in too much pain to drive) of $31.85, although Mrs. Betancourt said the latter were actually greater because she

2. She also briefly visited another chiropractor during this period, but discontinued seeing him after he would not accept payment by check.

3. It appears that Mrs. Betancourt's period of most acute distress was from November 1973, through March 1974. Thereafter, the jury could have found that she experienced occasional periods of pain and had difficulty turning her neck, as when parking.

had failed to keep records of all of the taxi rides. Dr. Rodriguez' course of treatments for three months would amount to about $240.

Mrs. Betancourt's children did not testify. It was stipulated that if they did they would corroborate their mother's testimony.

■ We first discuss the appropriateness of the $15,000 award to each of the four children. In Puerto Rico children may recover for "mental suffering, anguish and anxiety" sustained in reaction to a parent's injury. *Commercial Union Ins. Co. v. Gonzalez Rivera*, 358 F.2d 480, 483 (1st Cir. 1966). *See, e.g., Bonn v. Puerto Rico International Airlines*, 518 F.2d 89 (1st Cir. 1975). The only evidence bearing on the children's suffering is that found in their mother's testimony. We have little hesitancy in holding that the $15,000 awarded here to each child is grossly excessive and must be set aside. Taking the most expansive view of the evidence, Mrs. Betancourt's ability to function well as a parent was impaired for five months, through March, 1974—and, charitably, the jury might have found that many of her difficulties persisted until June, which would extend the period to seven months. During this period the children may be assumed to have suffered anxiety and loss, although conceivably they gained something in return in terms of assuming responsibility. None of the children were wage earners. In no event can we understand how the children's shock and anxiety, together with their loss of maternal companionship and help during this period, can be meaningfully translated into sums of $15,000 apiece. The family remained intact, albeit under strain. They did not lose time in school. There must be some relationship between the claim made and the reimbursement provided. *Compare Ganapolsky v. Park Gardens Development Corp.*, 439 F.2d 844, 847–48 (1st Cir. 1971).

■ Mrs. Betancourt's situation is closer but we find the $60,000 awarded her to be likewise grossly excessive. Even in these times of inflation, $60,000 is a sum normally reserved for substantial long term injuries. *See, e.g., Rivera v. Rederi A/B Nordstjernan, supra* at 975 (verdicts in $75,000 range sustained where carbon monoxide poisoning caused permanent, serious brain damage). In contrast, Mrs. Betancourt suffered several months of severe pain and restricted mobility. Since that time she has been subject to intermittent pain and may similarly suffer in the future. We think that this type of relatively less severe disability without substantial expenses and lost earnings does not justify an award of $60,000.[4] *See Wicks v. Henken*, 378 F.2d 395 (2d Cir.1967). Here there was no allowable claim for lost earnings, and medical expenses, actual and projected, were only $500. The award for pain, suffering and such other intangibles as are permitted under Puerto Rican law would be roughly one hundred times the amount of past and future medical bills. We think such an award simply makes no sense. We cannot, in conscience, allow it to stand.[5]

■ The amount of attorney's fees awarded also cannot stand. The federal court, in a diversity case although not otherwise, of course recognizes the Puerto Rican rule allowing attorney's fees to be awarded specially for obstinacy, *see Pan American World Airways, supra*, and we

---

4. Counsel for both sides cite various decisions of the Puerto Rico Supreme Court as authority for arguments that verdicts of the magnitude in this case are or are not reasonable. Such cases, though sometimes "instructive", *La Forest v. Autoridad de las Fuentes Fluviales*, 536 F.2d 443, 447 (1st Cir. 1976), are of only indirect significance since damage awards under Puerto Rico's non-jury system are subject to a more exacting standard of review than is employed by common law appellate courts in considering jury verdicts. *See id.* Certainly, however, those cited here do not indicate any likelihood that Mrs. Betancourt would have come close to receiving this amount in the Puerto Rico courts.

5. In a case where it is possible even roughly to compute the excessiveness of the verdict, we might give the plaintiff the choice of a remittitur in lieu of a new trial. In this case, an estimation of proper awards for Mrs. Betancourt and the children would rest solely on speculation. We therefore simply reverse for a new trial on the issue of damages.

have no reason to dispute the district court's finding that defendant's conduct was obstinate. If, however, the district court's computation was based on a fixed percentage of the damages award, *cf. Ortiz v. Great American Indemnity Co.*, 83 P.R.R. 296 (1961), then our setting aside of the damages award logically requires setting aside the award of attorney's fees; and there was no evidence in the record to guide the court in computing a reasonable fee based on the actual effort of the attorney for the plaintiff. *See Heirs of Trias v. Porto Rico Leaf Tobacco Co.*, 59 P.R.R. 228, 229 (1941).

We affirm the judgment of liability. We reverse on the issue of damages and remand for a new trial limited to this issue. After trial the court may reenter an award of attorney's fees.

*So ordered.*