In re IPSWICH BITUMINOUS
CONCRETE PRODUCTS,
INC., Debtor.

Harold P. MURPHY, Trustee, Plaintiff,

v.

Brian Jeffrey ROBINSON, Rita Robin-
son, Trustee of Ipsbit Realty Trust and
Individually John Cavatorta, Alfred
Aponas Ipswich Savings Bank, Colonial
Bank, Fairfield Group, Inc., Spruce
Mountain Development Corporation,
and Samian Home Builders, Inc., De-
fendants.

Bankruptcy No. 86–10148–JNG.
Adv. No. 86–1169.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 2, 1987.

Joan N. Feeney, Hanify & King, Boston, Mass., for plaintiff.

Jordan Shapiro, Shapiro & Shapiro, Malden, Mass., for defendants.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matter before the Court is the adversary complaint filed against the above named nine defendants by Harold P. Murphy, Chapter 7 Trustee (the "Trustee") of Ipswich Bituminous Concrete Products, Inc. ("Ipswich Bituminous" or the "Debtor"). The complaint was originally filed on June 20, 1986. It was amended on July 31, 1986 and again on August 13, 1986.

The Trustee and certain defendants, namely Brian Jeffrey Robinson ("Robinson") and Rita Robinson, individually and in her capacity as Trustee of Ipsbit Realty Trust, entered into a Stipulation for Judgment on February 24, 1987. The Stipulation for Judgment is opposed by George Brox, Inc. and Brox Paving Materials, Inc. It has yet to be approved by the Court. The Trustee applied for and was granted default judgments against both the Fairfield Group Ltd. and the Colonial Bank in October of 1986. The Trustee sought to enjoin a fifth defendant, the Ipswich Savings Bank, from foreclosing on property belonging to the Ipsbit Realty Trust through Count 2 of his complaint. The Court took no action with respect to the relief sought by the Trustee in Count 2. Although the Ipswich Savings Bank answered the complaint, it took no action to foreclose and the Ipsbit Realty Trust property was sold without opposition pursuant to a stipulation between the Trustee and the Robinsons.

With respect to the remaining four defendants, the Court bifurcated the trial of the case. The specific counts now before the Court are Counts 4, 5, 7, 8, 9, 10, 16, 17, 20, 22 and 26 against Alfred Aponas ("Aponas") and/or John Cavatorta ("Cavatorta") (collectively the "defendants").[1] Count 4 seeks damages in the amount of $23,500 for the Debtor's utilization of funds for improvements to property owned by the Ipsbit Realty Trust. Count 5 seeks damages in the amount of $500,000 and the imposition of a constructive trust on all property acquired by the defendants for breaches of their fiduciary duty of loyalty to the Debtor. Pursuant to section 548(a)(2) of the Bankruptcy Code, 11 U.S.C. § 548(a)(2) (West 1987), and Mass.Gen. Laws ch. 109A, §§ 4, 5 and 6 (West 1958 & Supp.1987), the Trustee, through Counts 7, 8, 9 and 10, seeks damages in the amount of $100,000 for an alleged fraudulent transfer—a stock redemption transaction that took place in September of 1985 in which Cavatorta and Aponas received distributions on account of their stock interests in the Debtor. Counts 16 and 20 of the complaint contain allegations that the distributions received by Cavatorta and Aponas in September of 1985, as well as monies spent on improvements to real estate in New Hampshire, were unlawful pursuant to Mass.Gen.Laws ch. 156B, § 61 (West 1970 & Supp.1987). Through Count 17, the Trustee seeks money damages or the turnover of equipment that Aponas and Cavatorta allegedly misappropriated and converted in September of 1985 at the time of

---

**1.** The Court notes that the complaint contains two counts identified as Count 3 and no Count 4. To avoid confusion, the Court has denominated the Count against the Robinsons and Aponas and Cavatorta for conversion as Count 4. The Trustee apparently has waived Count 18 through which he claimed $500,000 in damages for violations of Mass.Gen.Laws ch. 93A, since he fails to even mention it in his post-trial memorandum. The Court, therefore, will not consider Count 18.

the stock redemption transaction. Finally, Count 26 contains allegations that from its inception through the cessation of its business the Debtor was undercapitalized and that Aponas and Cavatorta disregarded the Debtor's corporate identity. Through Count 26, the Trustee seeks to impose personal liability for all corporate debts on Aponas and Cavatorta.

Cavatorta and Aponas filed an answer, counterclaim and cross claim against Brian Robinson on August 5, 1986. The gist of their defense is that the Debtor and Robinson, by written agreement, agreed to release and indemnify them against all claims and causes of action. The Court tried the case against Aponas and Cavatorta on April 9, 1987 and June 4, 1987. Seven witnesses testified and numerous exhibits were admitted into evidence. The Trustee, in accordance with the Court's instructions, submitted a detailed post-trial memorandum. The defendants did not do so.

## FACTS

The Debtor was incorporated as a Massachusetts corporation on March 27, 1984 for the purpose of purchasing, selling and installing bituminous concrete products and carrying on "any business permitted by the laws of the Commonwealth." Robinson, Aponas and Cavatorta were officers and directors. Each held one-third of the outstanding shares of common stock, although Robinson was the dominant shareholder by virtue of his age and office. He was named president and was responsible for handling the books, preparing bids on construction projects and collecting accounts receivable. Cavatorta, the treasurer, and Aponas, the vice-president, were responsible for supervising and performing the excavation and paving work. David Stern, an attorney who was instrumental in the formation of the corporation, but who had no role in the day to day operation of the corporation, was named clerk. During 1984, the three principals paid themselves approximately $700 per week. In 1985, they raised their salaries to approximately $800 per week.

On April 4, 1984, the Debtor purchased the assets of a concrete business from James Brady ("Brady"). The Debtor's principals, Robinson, Aponas and Cavatorta, did not pay any cash toward the purchase price of $410,000. Instead, they funded the purchase price by a $250,000 loan from the Ipswich Savings Bank, as well as by a loan from Brady in the amount of $120,000. The promissory note given in exchange for the loan was payable in six installments. Brady loaned the Debtor the $40,000 balance, which was secured by a mortgage, as well. The Debtor also entered into a two and one-half year employment agreement with Brady from which Brady was to receive one percent of the Debtor's annual sales. The Debtor further agreed to rent commercial space from Brady for $800 per month.

Although the principals did not invest cash in the business, they did contribute certain items of equipment. Robinson contributed a truck and a street sweeper. Cavatorta and Aponas contributed a Bobcat loader, a Case backhoe and a GMC dump truck. (Landscaping Unlimited, a partnership formed by Cavatorta and Aponas, actually owned the equipment prior to the Debtor's formation.) With this and other equipment, the Debtor began operating on April 5, 1984.

In November of 1984, the Debtor transferred its operations from the property leased from Brady at 99 Mitchell Road in Ipswich to Unit 4, Ipswich Business Park, 29 Hayward Street, Ipswich. The decision to move was predicated upon a pending increase in rent from $800 to $1200 per month and a deteriorating business relationship with Brady. The principals of the Debtor formed a nominee trust, the Ipsbit Realty Trust, to take title to the 29 Hayward Street property. Robinson, Cavatorta and Aponas initially were the trustees of the Ipsbit Realty Trust and their wives were the beneficiaries. The Debtor's principals funded the purchase of the real estate from the Katin/Quinn Development Group for $66,500 by a loan from the Ipswich Savings Bank in the amount of $125,000 which was secured by a first mortgage on the property. The Debtor used the bal-

ance of the loan proceeds and additional monies it supplied to purchase and construct a pre-fabricated building from the Morton Company of New Hampshire. As with the purchase of the Debtor's assets from Brady, the principals of the Debtor made no cash contributions to the purchase of the 29 Hayward Street property. Furthermore, although there was no lease between the Debtor and the Ipsbit Realty Trust, the Debtor paid the Trust's monthly mortgage payments of approximately $1,800 per month,[2] paid the utilities and occupied the building.

In its initial year of operation, the Debtor, according to Robinson, had "a very tough financial situation," with sales of approximately $1.5 million and expenses of $1.35 million. The business operated on a week-to-week basis because of hefty payments to Brady of approximately $25,000 per month, not to mention salaries, rent (replaced by mortgage payments to the Ipswich Savings Bank), and other business expenses. Indeed, both Aponas and Cavatorta admitted that the Debtor was always strapped for cash because of the payment obligations to Brady.

During the winter of 1984/1985, the slow season for the paving business, the Debtor's financial condition deteriorated. Nevertheless, the Debtor went ahead with a proposal to purchase property at Spruce Mountain near Jackson, New Hampshire. The Debtor made a deposit of $25,000 toward the purchase price and spent additional funds, totalling approximately $30,000, for engineering, architectural and water studies. Robinson testified that the objective behind the purchase of the Spruce Mountain property was "to have something to do in the off season and to deal with potential tax ramifications."

Toward the end of its off season, i.e., December through April, the Debtor was forced to borrow $75,000 from the Colonial Bank. On March 22, 1985, it executed a note and security agreement, pledging as security various items of equipment, including the items of equipment contributed to

the Debtor at its formation by Aponas and Cavatorta, namely the Case backhoe, the Bobcat loader and the GMC truck. All three of the Debtor's principals signed the loan documents in their corporate capacities and also personally guaranteed the repayment of the loan.

Throughout the spring and summer of 1985, Robinson, on the one hand, and Cavatorta and Aponas, on the other, had disagreements over the operation of the business. Aponas and Cavatorta were distressed about Robinson's handling of the finances and had serious reservations about remaining in business with him and proceeding with the development of the Spruce Mountain property. As a consequence, in early September, 1985, Robinson assigned the Debtor's interest in the Spruce Mountain property to the Fairfield Group which took title to the property. There was no evidence that Cavatorta or Aponas were involved in that decision.

At the same time, Cavatorta, Aponas and Robinson agreed that Cavatorta and Aponas would sell their stock back to the Debtor corporation for $100,000, or $50,000 apiece. On or about September 13, 1985, the principals effectuated the transaction, and Cavatorta and Aponas resigned as officers and directors of the Debtor and as trustees of the Ipsbit Realty Trust. Robinson testified that one half of the $100,000 came from the Debtor's accounts receivable and the remaining $50,000 came from the Debtor's interest in the Spruce Mountain property. In addition to their cash payments, Cavatorta and Aponas, upon their departure from the business, took two items of equipment they had initially contributed to Ipswich Bituminous. The defendants previously had sold the GMC dump truck for $6,000 and kept the proceeds. Although Cavatorta and Aponas assert in their answer that they continued to own the equipment after the Debtor's formation, there was no testimony to contradict the evidence that the equipment was pledged by the Debtor to secure the $75,000 loan from the Colonial Bank and was

---

**2.** From November 1984 until December of 1985, the Debtor, according to the Trustee in his post-trial memorandum, paid the monthly mortgage obligations of Ipsbit to the bank.

used exclusively by the Debtor in the operation of its business from April 5, 1984 through September 13, 1985.

The Debtor's outside accountant, James P. Pistorio, Jr. ("Pistorio"), testified about the Debtor's financial condition in 1984 and 1985. Based upon information received from the Debtor's bookkeeper and Brian Robinson, namely summarized records of cash disbursements, cash receipts, payroll, accounts receivable and accounts payable, Pistorio prepared financial statements for the Debtor and prepared corporate tax returns. According to Pistorio, as of July 31, 1985, the Debtor's balance sheet reflected $130,530.59 in owners' equity or profit of $47,730 for the first seven months of 1985 plus the book value of common stock and retained earnings. Three months later, on October 31, 1985 the balance sheet reflected, according to Pistorio, "a deficit situation to the tune of $210,000." In other words, the company showed a negative owner's equity of approximately $81,000. Although Pistorio did not count the equity in the Ipsbit Realty Trust as an asset in the preparation of the balance sheets, he did include "goodwill" as an asset with a value of $40,000. Although Aponas and Cavatorta attempted to show that the precipitous swing in owners' equity was somehow attributable to a dramatic rise in the amount of accounts payable, Pistorio was unable to testify from personal knowledge as to the cause of the increase. He did note, however, that the Debtor was having serious cash flow problems.

Pistorio also testified that he discussed the value of the Debtor corporation with Aponas and Cavatorta prior to September 13, 1985. He indicated that he advised Aponas and Cavatorta that he would not put any value on the corporation because the books were unaudited and because of the possibility that the book values of the

Debtor's assets might be overstated. However, Pistorio told Aponas and Cavatorta that there was value in the Ipsbit Realty Trust real estate,[3] and that there was equity over and above the loan of about $150,000. Stated another way, Pistorio "guesstimated" that the Ipsbit Realty Trust property was worth approximately $350,000.

In addition to Pistorio's testimony, Robinson, the Trustee, the Trustee's auctioneer and a real estate appraiser testified about the Debtor's financial condition and the value of the Debtor's assets. Robinson testified that as of September 13, 1985, the Debtor's liabilities exceeded its assets and the assets and liabilities consisted of the following:

| Assets: | Value |
|---|---|
| Equipment[4] | $450,000 |
| Accounts Receivable (collectible) | $100,000 |
| Equity in Ipsbit Realty Trust[5] | $ 45,000 |
| Equity in Spruce Mountain[6] | $ 25,000 |
| | $620,000 |

| Liabilities: | |
|---|---|
| Colonial Bank blanket security interest | $210,000 |
| Colonial Bank real estate mortgage | $ 80,000 |
| Ipswich Savings Bank loan | $ 20,000 |
| John Deere loan | $ 28,000 |
| Dresser Leasing loan | $ 30,000 |
| Accounts payable | $500,000 |
| Brady consulting fees | $ 17,000 |
| | $885,000 |

The Trustee's appraiser valued the Ipsbit property as of May 29, 1986 at $260,000. The Trustee sold the property for that amount in January of 1987. As of September 1985, encumberances on the property totalled approximately $215,000. The defendants failed to introduce any expert testimony to corroborate Pistorio's guesstimate of the property's value.

The Trustee testified that he reviewed the Debtor's books and records and that they showed $268,527.56 in accounts receivable as of September 13, 1985. He also

---

**3.** Pistorio testified as follows: "I said I didn't think the value of the corporation, based on the numbers that I had was worth more than zero. The real estate was where the value was."

**4.** The Trustee's auctioneer testified that the Debtor's equipment, excluding the equipment taken by Aponas and Cavatorta, sold in June of 1986 for $244,935 from which $11,233 was de-

ducted for the auctioneer's commission and expenses.

**5.** The defendants do not dispute the Trustee's contention that both the Ipsbit and Spruce Mountain properties are property of the estate.

**6.** See footnote no. 5.

indicated that the Debtor collected $98,926.60 of the accounts receivable and wrote off another $75,131.04. Of the remaining outstanding receivables on the books on September 13, 1985, which were valued at $94,469.92, the Trustee indicated that as much as $85,000 is likely to remain uncollected due to legitimate customer complaints about the quality of the Debtor's work.

With respect to the defendants' defenses, Cavatorta and Aponas failed to introduce any document purporting to be a blanket indemnity agreement. Moreover, their trial testimony relative to the financial condition of the Debtor was contradicted by their admissions at their 2004 examinations to the effect that the Debtor was debt ridden and plagued by cash flow problems.

## DISCUSSION

The Trustee's complaint contains four fraudulent conveyance counts against Cavatorta and Aponas. However, only those counts alleging constructive fraud under the Bankruptcy Code need be considered here, a point the Trustee perceived in his brief. Section 548 of the Bankruptcy Code provides in relevant part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—...

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

11 U.S.C. § 548(a)(2) (West 1987). Key terms in this section of the Code have special definitions in the bankruptcy context. Specifically, value "means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor," 11 U.S.C. § 548(d)(2)(A) (West 1987); and insolvent means:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title....

11 U.S.C. § 101(31)(A) (West 1987).

■ It is abundantly clear from the evidence presented that the Trustee has established the requisite elements entitling him to relief under section 548. The stock redemption transaction, in which there was "a transfer of an interest of the debtor in property," took place within one year of the filing of the bankruptcy petition,[7] at a time when the Debtor was insolvent (or, alternatively, at a time when the Debtor was rendered insolvent). The stock received by the Debtor in exchange for the $100,000 payment to Cavatorta and Aponas simply did not have a value reasonably equivalent to $100,000.

The Bankruptcy Code prescribes a standard balance sheet test for determining solvency. *Briden v. Foley,* 776 F.2d 379, 382 (1st Cir.1985). The test "focuses on the fair market value of the debtor's assets and liabilities within a reasonable time of the transfers. Asset valuation need not be exact. Assets should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts." *Id.* Moreover, the United States Court of Appeals for the First Circuit has expressly approved the technique of retrojection, whereby a trustee may meet his burden of proof on the issue of insolvency by showing that the debtor was insolvent at a reasonable time subsequent to the alleged transtered on March 19, 1986.

---

**7.** The involuntary bankruptcy was filed on February 7, 1986 and the order for relief was entered on March 19, 1986.

fer, accompanied by proof that the debtor's financial situation did not change materially during the intervening period. *Id. See also Braunstein v. Massachusetts Bank & Trust Co.*, 443 F.2d 1281, 1284 (1st Cir. 1971); *Hassan v. Middlesex County National Bank*, 333 F.2d 838, 840 (1st Cir.), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); *In re Candor Diamond Corp.*, 76 B.R. 342, 349 n. 6 (Bankr. S.D.N.Y.1987); *In re Kaylor Equipment & Rental, Inc.*, 56 B.R. 58, 62 (Bankr.E.D. Tenn.1985). Additionally, the First Circuit has held that "unaudited financial statements may be admissible as the best available evidence and that it is for the trier of fact to assess the accuracy of such statements." *In re Roco Corp.*, 701 F.2d 978, 983 (1st Cir.1983). *See also Braunstein v. Massachusetts Bank & Trust Co.*, 443 F.2d at 1284.

As of October 31, 1985, the Debtor's unaudited balance sheet shows that its liabilities exceeded its assets. Although the balance sheet dated July 31, 1985 shows assets exceeding liabilities, the values attributed to the Debtor's accounts receivable, goodwill and machinery and equipment were inflated. Moreover, Robinson's strong testimony established that the Debtor's liabilities exceeded its assets as of September 13, 1985 and that the Debtor's financial condition did not change materially between that date and the end of October 1985.[8]

With respect to the stock redemption transaction, the Debtor received nothing but two-thirds of its outstanding stock, which in view of the Debtor's insolvency was worthless. The Court of Appeals for the First Circuit discussed the redemption of stock in the context of section 548(a)(2) of the Bankruptcy Code in *In re Roco Corp.*, 701 F.2d 978 (1st Cir.1983), a case factually similar to the instant case. The court stated:

In finding that the redemption of Consove's shares of Roco was a fraudulent transfer under section 548(a)(2), the bankruptcy court held that Roco received less than reasonably equivalent value for the $300,000 note and security interest it gave Consove. Indeed, Roco received nothing but all of its outstanding stock. We agree with the bankruptcy court that this stock was virtually worthless to Roco. Under generally accepted accounting principles this treasury stock would be reported on the balance sheet of Roco as a reduction of stockholders' equity, not as an asset. See generally R. Anthony & J. Resse, Accounting Principles 215 (4th ed. 1979) ("Treasury stock is clearly not an 'economic resource' of an entity."). As the appellate panel noted, treasury stock is a form of shareholder distribution from which the corporation receives no assets. When a corporation purchases treasury stock it reduces its capitalization.

*Id.* at 982. The court underscored its position by citing cases holding that shares of stock sold back to an insolvent corporation are valueless. *See Schafer v. Hammond*, 456 F.2d 15, 17–18 (10th Cir.1972); *Lytle v. Andrews*, 34 F.2d 252, 253–54 (8th Cir. 1929); *M.V. Moore & Co. v. Gilmore*, 216 F. 99, 100–01 (4th Cir.1914).

In light of the above discussion, the Court finds that the Trustee may avoid as a fraudulent conveyance the Debtor's transfer of $100,000 to Cavatorta and Aponas and is entitled to recover $100,000 from them.

Since the Court has found that the Trustee is entitled to recover $100,000 from Cavatorta and Aponas on Counts 7 and 9 of his complaint, it is unnecessary for the Court to consider Counts 8 and 10 through which the Trustee seeks the same relief based upon Massachusetts' version of the Uniform Fraudulent Conveyance Act,

---

**8.** At the trial, Aponas and Cavatorta objected to Robinson's testimony about the value of the Debtor's assets. The Court overruled the objection. The Trustee established that Robinson was knowledgeable about the Debtor's assets and prices paid for machinery and equipment used in the paving industry. Under the Federal Rules of Evidence, as an officer and director of the Debtor, Robinson was competent to testify as to his opinion of the value of the Debtors assets. *See Carlson Equipment Co. v. International Harvester Co.*, 710 F.2d 481 (8th Cir.1983); *South Central Livestock Dealers, Inc. v. Security State Bank*, 614 F.2d 1056 (5th Cir.1980).

Mass.Gen.Laws Ann. ch. 109A, §§ 4, 5 and 6 (West 1958 and Supp.1987). Likewise, an indepth analysis of Count 16, which is predicated upon Mass.Gen.Laws Ann. ch. 156B, § 61 (West 1970 & Supp.1987), is unwarranted since the Trustee through that count also is seeking to hold Cavatorta and Aponas jointly and severally liable for the $100,000 distributed to them by the Debtor in exchange for their stock.

■ Section 61 of the Massachusetts Business Corporation Law ("MBCL") provides:

Directors of a corporation who vote to authorize any distribution by the corporation to one or more of its stockholders, whether by way of a dividend, repurchase or redemption of stock, or otherwise, except a distribution of stock of the corporation, which is in violation of the corporation's articles of organization shall be jointly and severally liable to the corporation for the amount by which such distribution exceeds that which could have been made without violation of the corporation's articles of organization, but only to the extent such excess distribution is not repaid to the corporation. If the corporation is insolvent or is rendered insolvent by the making of any such distribution, whether or not in violation of the articles of organization, the directors who voted to authorize such distribution shall be jointly and severally liable to the corporation for the amount of such distribution made when the corporation is insolvent, or for the amount of such distribution which exceeds that which could have been made without rendering the corporation insolvent, but in either event only to the extent such distribution, or such excess, is not repaid to the corporation. In no event shall the directors who authorized any such distribution be liable under this section if such distribution could have been made without violating the articles of organization or rendering the corporation insolvent at the time when such distribution was authorized, although subsequent payment of such distribution or any part thereof causes such violation or insolvency.

Mass.Gen.Laws Ann. ch. 156B, § 61 (West 1970 & Supp.1987). Its basic purpose is "to prevent distributions to stockholders ... which would be prejudicial to creditors of a corporation." *Brigham v. M. & J. Corp.*, 352 Mass. 674, 681, 227 N.E.2d 915 (1967). Since the Court has found that the Debtor was insolvent (or at least rendered insolvent by the distribution), the Court has no difficulty finding that Cavatorta and Aponas are jointly and severally liable for the $100,000 pursuant to section 61 of the MBCL as well as section 548 of the Bankruptcy Code. However, with respect to Count 20 through which the Trustee seeks to hold Cavatorta and Aponas liable, based upon section 61 of the MBCL, for the sums spent by the Debtor on the Spruce Mountain property, the Court is firmly convinced that the Trustee failed to introduce sufficient evidence for the Court to find that those expenditures, at the time they were actually made, violated the Debtor's articles of organization or rendered the Debtor corporation insolvent. Although the Trustee established that a $25,000 deposit was paid toward the purchase price of the Spruce Mountain property and that the Debtor spent funds for engineering studies and the like, the exact timing of payments and the Debtor's financial position at the time of those payments were not established during either the April 9th or June 4th hearing. Indeed, in his post-trial memorandum, the Trustee appears to waive Count 20 by failing to argue its merits.

The Trustee's complaint contains three counts predicated on the common law of conversion. Counts 4 and 22 pertain to monies spent on the Hayward Street and Spruce Mountain properties whereas Count 17 pertains to the equipment that Aponas and Cavatorta took with them when they resigned their positions as officers and directors of the Debtor.

■ As the Trustee correctly notes, a prima facie case of conversion requires a showing of "the wrongful exercise of dominion over personalty, including money, to which a plaintiff has immediate right to possession." *Schmid v. National Bank of Greece, S.A.*, 622 F.Supp. 704, 713 (D.Mass.

1985), *aff'd*, 802 F.2d 439 (1st Cir.1986). A demand is an unnecessary preliminary to an action for conversion where the defendant's possession is wrongful in its inception. A demand is only necessary when the defendant's possession is not wrongful from the beginning. *Atlantic Finance Corp. v. Galvam*, 311 Mass. 49, 50, 39 N.E.2d 951 (1942). In an action for conversion, the measure of damages is the fair and reasonable market value of the personalty at the time of the conversion. *Joy Stevens of California v. Plymouth Finishing Co.*, 355 Mass. 390, 245 N.E.2d 236 (1969). Moreover, when two or more individuals commit a conversion, they are jointly and severally liable for the damages. *Refrigeration Discount Corp. v. Catino*, 330 Mass. 230, 112 N.E.2d 790 (1953).

■ With respect to the three pieces of equipment that Cavatorta and Aponas owned as partners of Landscape Unlimited, the issue is simply whether the Debtor or Aponas and Cavatorta owned them on September 13, 1985. The evidence on this point is conflicting. Cavatorta and Aponas testified that it was not their intention to relinquish ownership of the equipment when Ipswich Bituminous was formed. Nevertheless, in view of the undisputed facts that none of the principals contributed any cash toward the purchase price of the business from Brady, that the equipment was used exclusively by the Debtor and stored at the Debtor's place of business, and that the equipment was pledged to the Colonial Bank as security for a loan to the Debtor, the Court is not persuaded by the testimony of Cavatorta and Aponas. Moreover, their testimony is at odds with Robinson's testimony. Robinson indicated that he considered the Debtor to be the owner of all the property contributed to the business by the three principals.

Robinson also testified as to the value of the Bobcat, Case backhoe and GMC truck. He indicated that the GMC truck was sold by Aponas and Cavatorta for approximately $6,000 prior to the termination of their relationship with the Debtor. He opined that the value of the Case backhoe was approximately $7,500 and the value of the Bobcat was approximately $7,000. Aponas testified that the Case backhoe was worth no more than $5,000 in September of 1985 and that the Bobcat was worth approximately $2,500. Cavatorta testified that all three items of equipment were only worth between $9,000 and $10,000. In his complaint, the Trustee seeks turnover of the equipment or $15,000. In view of the conflicting testimony as to the value of the equipment, however, the Court concludes that while the Trustee is entitled to judgment on Count 17, his recovery should be limited to $10,000.

With respect to Counts 4 and 22 through which the Trustee seeks the recovery of the funds spent on the Ipsbit Realty Trust property and the Spruce Mountain property, the Court notes that the Trustee did not address these two counts in his post-trial memorandum. Although the Trustee asserts that he is entitled to recover the $23,000 spent by the Debtor on improvements to the Hayward Street property, he relies on a breach of fiduciary duty theory rather than a conversion theory. Accordingly, the Court will address the recovery of those monies in the context of Count 5.

■ In *In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d 1222 (8th Cir. 1987), the Court of Appeals for the Eighth Circuit determined that sections 704 and 541 of the Bankruptcy Code "give the trustee authority to bring an action for damages on behalf of a debtor corporation against corporate principals for alleged misconduct, mismanagement or breach of fiduciary duty, because these claims could have been asserted by the debtor corporation, or by its stockholders in a derivative action." *Id.* at 1225. The Trustee maintains that Cavatorta and Aponas breached their fiduciary duties as directors by usurping various corporate opportunities available to the Debtor, namely the opportunities to acquire the Hayward Street and Spruce Mountain properties. While the Court does not doubt that Cavatorta and Aponas breached their duty of loyalty to the Debtor corporation, at least with respect to the acquisition of the Hayward Street property, the Court is unable to con-

clude that the Trustee is entitled to the $23,000 spent by the Debtor on improvements to that property since those improvements clearly inured to the benefit of the bankruptcy estate. When the property was sold, the Trustee, by agreement of the parties, obtained the equity in the property. Accordingly, in the Court's view, it would be unfair to hold Cavatorta and Aponas liable for that sum.

■ The sums expended by the Debtor toward purchasing and improving the Spruce Mountain property present a somewhat different picture, however. At about the same time as the departure of Aponas and Cavatorta, the Fairfield Group Ltd. acquired the Spruce Mountain property and the Debtor obtained no benefit from the acquisition and was not reimbursed for its expenditures. Despite these undisputed facts, and the fact that Cavatorta and Aponas originally agreed to purchase the property, the Court notes that Aponas and Cavatorta were hesitant to go ahead with the project. Indeed, the testimony reveals that the breakdown in the relationship between Robinson on the one hand and Cavatorta and Aponas on the other was due in large part to disagreements over going forward with this endeavor. Indeed, the evidence shows that Robinson spearheaded the effort to acquire the Spruce Mountain property and there was no evidence that he kept Aponas and Cavatorta informed about what was transpiring. In these circumstances, the Court is unable to conclude that Aponas and Cavatorta should be held liable for the monies expended by the Debtor on the Spruce Mountain property.

■ Finally, through Count 26 the Trustee seeks to impose personal liability on Aponas and Cavatorta for all of the Debtor's debts because the company was undercapitalized throughout its history and because Aponas and Cavatorta allegedly disregarded the separate corporate identity of the Debtor. The Court is not inclined to grant judgment to the Trustee on Count 26, although the defendants through oversight or neglect failed to answer the Trustee's amended complaint containing Count 26, for three reasons. First, there was ˙no

direct evidence that the Debtor, in fact, was undercapitalized from its inception, although it certainly was so in September of 1985. Second, the Trustee failed to cite any cases from Massachusetts where the corporation or its stockholders, as opposed to creditors or third parties, have been permitted to assert an alter ego cause of action to pierce the corporate veil. Finally, in Massachusetts the standard for disregarding the corporate entity is quite strict. The leading Massachusetts case on the subject, *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968) enunciates a standard for ignoring separate corporate existences of a group of corporations under common ownership and control and contains dicta to the effect that a "corporation or other person controlling a corporation and directing, or participating actively in its operations may become subject to civil or criminal liabilities on principles of agency or causation." *Id.* at 618, 233 N.E.2d 748 (citations omitted). In view of the evidentiary problems and the disinclination of Massachusetts' courts to pierce the corporate veil absent elements of injustice or fundamental unfairness, *In re WJM, Inc.*, 65 B.R. 531 (Bankr.D.Mass.), *aff'd*, Bankruptcy Appeal No. 86–3180–MA, slip op. (Dec. 30, 1986); *see also In re Distrigas Corp.*, 75 B.R. 770 (Bankr.D.Mass.1987), the Court is not convinced a judgment against Cavatorta and Aponas on Count 26 is required.

In accordance with the foregoing, judgment is entered in favor of the Trustee in the amount of $110,000 and against Cavatorta and Aponas who shall be jointly and severally liable for the judgment amount.

So ordered.